2025 IL App (2d) 240194
Nos. 2-24-0194 & 2-24-0195 cons.
Opinion filed December 15, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 20-TR-1770 20-CM-153 |
| DION R. HOLMES, | ) ) | Honorable Rene Cruz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justice Mullen concurred in the judgment and opinion.
Justice Hutchinson concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 A jury convicted defendant, Dion R. Holmes, of unlawful possession of cannabis by a driver and criminal damage to property. He was sentenced to 12 months' court supervision for each charge, concurrent with additional requirements including an order to pay fines. Defendant appeals his conviction, arguing the trial court erred when it admitted a forensic laboratory report that concluded the substance he relinquished to police was cannabis and allowed an expert to testify to the conclusion of the report as a surrogate due to the death of the author. Defendant also contends the court abused its discretion when it failed to remedy the State's late disclosure of its surrogate expert witness, who served as a vehicle to testify about the contents of the report. In

addition, defendant challenges the sufficiency of evidence regarding his conviction of criminal damage to property. Further, he claims trial counsel was ineffective by failing to move to suppress the evidence collected during a traffic stop. Finally, defendant argues the court improperly instructed the jury on the charge of unlawful possession of cannabis by a driver. For the following reasons, we reverse the conviction of unlawful possession of cannabis by a driver and affirm the conviction of criminal damage to property. We remand this cause for a new trial on the charge of unlawful possession of cannabis by a driver.

¶ 2                                         I. BACKGROUND

¶ 3       On January 8, 2020, near midnight, a police officer patrolling the parking lot of an apartment complex observed a vehicle driving southbound with what appeared to be only one working headlight. The officer stopped the vehicle, told defendant, the driver and only occupant, that his headlight was out, and searched the car after smelling cannabis and viewing an open bottle of liquor in the back seat. The officer recovered a small plastic bag of what he believed to be cannabis and an open glass bottle of liquor from the car. After detaining defendant, the officer took him to the police station to perform sobriety tests. He momentarily left defendant in a holding room and returned to find defendant urinating on a furnace. Defendant was charged with unlawful possession of cannabis by a driver (625 ILCS 5/11-502.15(b) (West 2020)), criminal damage to property not exceeding $500 (720 ILCS 5/21-1(a)(1) (West 2020)), driving under the combined influence of alcohol and drugs (DUI) (625 ILCS 5/11-501(a)(5) (West 2020)), illegal transportation of alcohol by a driver (*id.* § 11-502(a)), and improper headlights or taillights (*id.* § 12-201(b)).[1] The commission of these violations, with the exceptions of illegal transportation of

_____

[1]The common law record includes an Illinois citation and complaint from the Carpentersville Police

alcohol by a driver and improper headlights or taillights, is a Class A misdemeanor. See *id.* §§ 11-501(c)(1), 11-502.15(d), 11-502(e); 720 ILCS 5/21-1(d)(1)(B) (West 2020).

¶ 4                              A. Pretrial

¶ 5      After defendant's initial appearance, he filed a motion for discovery and a demand for speedy trial on September 28, 2020. The discovery motion included a request for a list of witnesses expected to testify at trial and "reports made by law enforcement officials," including "the results of scientific tests, experiments or comparisons," and "any reports or statements of experts made in connection with the case, including the results *** of scientific tests, experiments or comparisons."

---

Department, dated January 8, 2020, listing only the charge of unlawful possession of cannabis by a driver (625 ILCS 5/11-502.15(b) (West 2020)). The report of proceedings lists five separate trial court case numbers for defendant (20-DT-49, 20-TR-1768, 20-TR-1769, 20-TR-1770, and 20-CM-153). The only document in the record discussing the other charges and their dispositions is the trial court order entered on December 20, 2023; however, not all of the case numbers and their corresponding charges are delineated. For clarity, we may take judicial notice of the online docket of court filings issued by the clerk of the circuit court of Kane County. See *e.g.*, *All Purpose Nursing Service v. Human Rights Comm'n*, 205 Ill. App. 3d 816, 823 (1990) (citing *People v. Davis*, 65 Ill. 2d 157 (1976)). The docket report is a matter of record of which this court may take judicial notice, as its contents are not difficult to ascertain. *Boston v. Rockford Memorial Hospital*, 140 Ill. App. 3d 969, 972 (1986). The online docket of the circuit court of Kane County reflected the case numbers and dispositions for defendant's cases as follows: (1) 20-DT-49, finding of not guilty of DUI on December 19, 2023; (2) 20-TR-1768, *nolle prosequi* of improper head or tail lights on December 19, 2023; and (3) 20-TR-1769, finding of not guilty for transportation or possession of open alcohol on December 19, 2023. The December 20, 2023, order states that in case Nos. 20-TR-1770 (unlawful possession of cannabis by a driver) and 20-CM-153 (criminal damage to property), the jury returned guilty verdicts.

¶ 6    The trial court continued defendant's case five times by agreement of the parties and on June 30, 2021, the court entered an order stating that, at the next status hearing, a date would be set for trial. At the next hearing on September 1, 2021, the parties agreed by motion to continue the case. The court order entered on October 6, 2021, stated, "[i]f parties answer ready on [January 20, 2022], [the] case will be continued to [January 25, 2022] at 8:30 am for jury selection."

¶ 7    On December 1, 2021, the State tendered to defendant the Illinois State Police (ISP) laboratory report authored by forensic scientist Martin Skelcy, who had tested the alleged drug samples. No other forensic scientist's name appeared in the report. The heading on the laboratory report included the ISP seal with the name and address of the division of forensic services. The report, dated June 4, 2020, stated that Skelcy completed testing of 3.2 grams of suspected cannabis and concluded that the tested material was cannabis. At the end of the report, Skelcy stated:

"I have personally completed this report. Under penalties of perjury, I certify I have examined all of the information provided for this document related to the analysis conducted for this report and, to the best of my knowledge, it is true, correct, and complete."

The report, however, was not notarized.[2]

---

[2]Section 115-15(a) of the Code of Criminal Procedure of 1963 requires that laboratory reports prepared by the ISP's Division of Forensic Services must attach to the report "a copy of a notarized statement by the signer of the report giving the name of the signer and stating[:]

(i) that he or she is an employee of the Department of State Police, Division of Forensic Services,

(ii) the name and location of the laboratory where the analysis was performed,

(iii) that performing the analysis is a part of his or her regular duties, and

(iv) that the signer is qualified by education, training and experience to perform the analysis." 725

¶ 8    On January 20, 2022, the parties appeared for pretrial video conference, and both answered ready for trial.[3] The trial court made some rulings on the parties' motions *in limine*, continued other rulings for the morning of trial, and set the matter for trial on January 25, 2022.

¶ 9    The next day, the trial court reset the date of the jury trial to September 6, 2022, with the agreement of the parties "[d]ue to other jury trials proceeding." The January 21, 2022, order also stated that discovery issues and, in reference to the demand for speedy trial, "any other 725 ILCS 5/114-1 et seq. pretrial motions [(725 ILCS 5/art. 114 (West 2020))] are considered either waived, withdrawn or otherwise resolved by the setting of the matter for trial." In addition, the order stated that "[c]ounsel for all parties are each responsible" at the pretrial call for a "[l]ist of any witnesses and exhibits prepared for the Court."

¶ 10   On September 1, 2022, the trial court entered an order following defendant's oral motion for continuance, which was granted over the State's objection. During the hearing, the State answered that it was ready for trial and defendant answered that he was not ready for trial.

¶ 11   At the next hearing on November 2, 2022, the trial court entered an order on the parties' motion for continuance by agreement and set the matter for pretrial conference on February 16, 2023, and trial on February 21, 2023.

¶ 12   On February 16, 2023, defendant, who did not appear at the hearing, again moved to continue the trial date because he was not ready for trial. This hearing was conducted before a different trial judge than the one who ultimately presided at trial. Defense counsel stated that she "had trouble getting in contact" with defendant. The State answered that it was ready for trial. The

---

ILCS 5/115-15(a) (West 2020).

[3]The record on appeal includes neither the State's answers to defendant's discovery motion nor the parties' list of disclosed witnesses expected to testify at trial.

assistant state's attorney told the trial court, "[w]e would be objecting for the record, but practice in Judge Cruz's courtroom [provides that] he does allow one continuance per side, so this would be the first setting and I wanted to make [the court] aware of that." The court granted defendant's motion to continue over the State's objection.

¶ 13 The parties appeared at the next hearing on March 24, 2023, and moved by agreement to continue the case for plea. The parties again moved by agreement to continue the case for plea on April 28, 2023.

¶ 14 At a May 5, 2023, status hearing, the trial court granted the parties' motion for continuance by agreement and set the matter for pretrial conference on September 7, 2023, and jury trial on September 12, 2023.

¶ 15 On September 5, 2023, the State moved to continue the jury trial set for September 12. The motion stated that Skelcy was a material witness and that he had passed away on August 31, 2023.

¶ 16 The trial court conducted an "off call" videoconference hearing on September 6, 2023, to consider the State's motion to continue the September 12 jury trial. The September 6, 2023, court order reflects that the matter was off record and the court reporter was "waived." The court entered a motion for continuance by agreement of the parties. The order also stated that "[t]his matter [is] before the Court for State's Motion to Continue Jury Trial. Over Defense's objection, Motion to Continue is granted. Matter set for status and resetting of jury trial." At a September 27, 2023, status hearing, the trial court set the matter for trial on December 19, 2023.

¶ 17 On December 14, 2023, the trial court conducted a pretrial hearing, where both parties answered that they were ready for trial. The court considered the parties' motions *in limine* and asked the State about the list of witnesses it planned to present at trial. The State responded, "[t]he only person that will be changing is *** the person that tested the cannabis. It's going to be Rhonda

Earl instead of Martin Skelcy." The State informed the court that Skelcy had passed away and that the witness list needed to be updated to add Earl. The court set the matter for trial on December 19, 2023.

¶ 18    On December 15, 2023, defendant filed a motion to bar Earl's testimony, arguing, among other things, that the State had failed to disclose Earl in a timely fashion necessary to prepare an adequate defense in violation of Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) and *Brady v. Maryland*, 373 U.S. 83 (1963). In addition, defendant contended that the State had violated the continuing duty of disclosure under Illinois Supreme Court Rule 415(b) (eff. Oct. 23, 2020). He sought to bar Earl as a sanction for the alleged discovery violation.

¶ 19    The trial court heard defendant's motion on December 18, 2023. Defendant argued that he received two additional discovery disclosures since filing the motion to bar Earl's testimony—Skelcy's laboratory notes and Earl's peer review checklist, which Earl had signed but not dated. Defense counsel stated that when she reviewed the case file, she observed that the State had subpoenaed Earl in October 2023 but did not provide notice to defendant. Defense counsel stated, "I don't think I was entitled to notice that the State had issued a subpoena," but first learned the disclosure of Earl as a trial witness at the December 14 pretrial conference. Defendant argued that Earl's involvement was limited to the proofreading of Skelcy's report and "if that's the extent of Ms. Earl's testimony, that testimony would be hearsay." Defendant contended that Earl did not have any personal knowledge regarding the preparation of the laboratory report Skelcy authored. Defense counsel continued:

> "Had Mr. Skelcy been able to testify, he would be able to testify as to his qualifications to perform the testing, factors that were present that could have affected the results of the test *** [and] chain of custody for the sample he received.

Based on what I received, I don't think Ms. Earl can testify as to any of that."

¶ 20    In response, the State noted that the assistant state's attorney and the assistant public defender then-assigned to the case had discussed attempts to locate the forensic scientist who had peer reviewed Skelcy's findings to testify at trial after he passed away. The State continued, "[i]n terms of all the evidence that we had, we did disclose that to them. It doesn't change anything about the evidence that we had other than *** getting the specific name of this person." The State argued that defendant had knowledge of Skelcy's death and that the State was attempting to locate the peer reviewer. The State agreed that the defense learned the name of the peer reviewer on December 14, 2023, but stated that defendant "at least knew that somebody was going to be replacing this person. It's not like they didn't know that nobody was there."

¶ 21    The State then proffered Earl's proposed testimony as follows:

"Ms. Earl peer reviewed all the information that Martin Skelcy obtained when he did his forensic analysis of the cannabis itself and she would be testifying as to the analysis that Mr. Skelcy did as a peer reviewer.

Her training and experience would be exactly the same as Mr. Skelcy's would be except that she just *** double checked his work and made sure it was all *** according to their standard practice.

Obviously [Skelcy's] not here to testify to that and yes, it is hearsay; however, he is not here to testify. He is unavailable. And that would be an exception to the hearsay rule."

¶ 22    Following the parties' arguments on defendant's motion, the trial court first noted that the State issued subpoenas to Earl on October 3, 2023, and October 16, 2023. The court then denied defendant's motion as follows:

"So barring a witness in this type of scenario would be the most severe sanction the Court could do. I'm not inclined to do so at this time. However, [defense counsel], if this does impact your ability to be prepared for jury tomorrow, I would give another date if you felt it was necessary in order to be properly prepared."

¶ 23    On December 19, 2023, before jury selection began, defendant renewed his motion to bar Earl's testimony because the State had tendered her curriculum vitae on the night before trial. Defendant argued that the State would be unable to lay a foundation for Skelcy's report through Earl's testimony. Defense counsel continued,

"I understand that the State anticipates she's going to testify as to the conclusions that Mr. Skelcy came to based on the results of the test. The notes that I have from Mr. Skelcy and the lab reports do not include any information as to how this test was conducted or establishing any sort of chain of custody for the sample that he received."

Defendant argued that Earl lacked personal knowledge and that the State "would be essentially skipping the foundational requirement and going straight to the result which is the report." In addition, defendant contended that the report itself was hearsay not subject to any exceptions and that it was testimonial. According to defendant, Earl's testimony would violate his right to confrontation under the sixth amendment to the United States Constitution (confrontation clause) (U.S. Const., amend. VI).

¶ 24    In response, the State argued that Earl had "known Mr. Skelcy for many, many years [and] had been employed with him for a long period of time," and was familiar with the same policies and procedures Skelcy used to perform the tests to complete the laboratory report. The trial court then asked the State to address how it planned to lay a foundation to introduce the report. The State responded that Earl "would testify to patterns and practices used within ISP. She would testify that

not only *** did Skelcy use those patterns and practices, but [she] also practiced the same way that Mr. Skelcy does, the same way she is taught, as well." The State continued that Earl was familiar with (1) the same procedures Skelcy used to author his report, (2) Skelcy's report as a peer reviewer, and (3) how Skelcy conducted the tests to conclude the material tested was cannabis. The State argued that the report should be admitted under the business records exception because Skelcy was unavailable, Earl was the peer reviewer, and she had reviewed his work for this specific case.

¶ 25    Defendant argued in reply that the laboratory report was a testimonial document and not a business record. He noted that the report "was sent off by the Carpentersville Police Department specifically *** to attempt to establish evidence against the defendant for this case. That is the definition of a testimonial statement." According to defendant, Earl's proposed testimony was nothing more than speculation because she lacked personal knowledge.

¶ 26    The trial court then asked defense counsel, "[s]o the lab technician passes away, the case goes away as well, that's the theory?" Defense counsel responded, "the State could have sent the sample for retesting." The court excused the parties briefly to consider the issue.

¶ 27    Upon return, the State informed the trial court that it intended to offer Earl "as an expert in the field of chemical analysis, specifically cannabis," because under the rules of evidence relating to experts, Earl "can testify as to the reports generated by Mr. Skelcy along with the notes and the notes packet and how he tested the cannabis." The court then referred to the business records exception to hearsay under Illinois Rule of Evidence 803(6) (eff. Jan. 25, 2023) and found that Skelcy's report qualified as an exception under this rule. The court stated that if the report is "strictly coming in for a business record, then you can have anyone that's a keeper of the record testify that that record comes in." The court questioned whether Earl

"will come in and testify about something else, actually something substantive and being used as an expert. I'm not sure if that's how she was disclosed or not, that she was strictly coming in to bring in this report and now she's coming in to talk about the impact or effects of cannabis in the system *** as a result."

¶ 28    The State clarified that it was not going to ask Earl questions about how cannabis affects an individual; rather, it sought to ask Earl about the laboratory report—how the analysis was conducted, how she peer reviewed the report, and the purpose of the peer review.

¶ 29    The trial court then stated,

"[s]o the question I'm asking myself is can she tell us how it was conducted, I don't think she can. I think she can tell us there is a business record and this is the result from that— this is what the report says came out as a result of that test."

Defendant responded that "[t]he point of bringing in the person who prepared this report is to ask if there was [*sic*] any typos in there, if there is any way that someone's name could be mixed up with it." Defendant argued that Earl should not be able to testify about the substantive findings in the report because "[t]here is no way to cross-examine that document" and how Skelcy arrived at his findings.

¶ 30    The trial court stated that the laboratory report "still comes in as an exception to the hearsay rule as a business record. The question is what is [Earl] able to add to that record." Defendant argued that Earl was not the keeper of the records that would satisfy the foundation to establish a business record. The State responded that laboratory reports are generated after an item is tested. The State explained that "[w]hen a forensic scientist is conducting chemical testing, they write down things in their note packet and then [Earl] as the peer reviewer does fill out a three-page document that's essentially a yes or no of all the things that she reviewed." The State then offered

an alternative solution to retest the material. Defendant objected to the State's offer to retest the material, stating, "[t]his is a 2020 case. I understand that this witness passed away late August or early September. The State could have at that point sent the sample off to be retested if there was a sample that was able to be retested."

¶ 31     The trial court ruled on this issue as follows:

> "The whole reason we're having this conversation is because of the delay in disclosure of this witness and what this witness may be testifying to.
>
> Again, I'm looking at this as strictly a business record. If she's coming in to tell us it's a business record, that's great. But I don't think she can step into the shoes of the individual and then start giving her analysis as to how it may or may not have been conducted. It stands on its own, but it is admissible as an exception to hearsay."

¶ 32     Defense counsel asked the trial court to clarify whether the State would be allowed to lay a foundation for the admission of the laboratory report under the business records hearsay exception through Earl's testimony. The court clarified that Earl:

> "would be able to tell us what [the report] says without interpretation. So if there is a conclusion that's on there, that's what she can give us. She can't tell us about process because she can't tell us whether the process was done. But it's presumed to be, if it's kept as a record, reliable and an exception to hearsay.
>
> So if there is a result that the State needs as a result of what the toxicology report ended up saying, again that goes more to weight than admissibility.
>
> If you want to ask her and she didn't particularly do it, did somebody else do it, there [are] mistakes that could have been made, etcetera, that's fine. But the end results come in as a result of the testing indicated."

¶ 33    After the jury was selected the State asked the trial court to reconsider its findings regarding Earl's proposed testimony. The State argued that, although Earl neither participated in the testing of the cannabis nor observed the testing procedure, she should be qualified as an expert to testify about her review of Skelcy's laboratory report, considering that Skelcy was unavailable. Defendant responded that the confrontation clause

> "does not permit the prosecution to introduce a forensic laboratory report containing a testimonial certification made in order to prove a fact at a criminal trial through the in court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification."

Defendant contended that his right "is to be confronted with the analyst who made the certification unless that analyst is unavailable at trial and the accused had an opportunity pretrial to cross-examine that particular scientist. That's exactly what we have here." Defendant continued that he had no opportunity to cross-examine Skelcy and that the purpose of the confrontation clause is to allow cross-examination of the person who authored the laboratory report. Defendant stated that if Earl "wants to come and testify as an expert, she can give her opinion as to what she reviewed but she can't also lay the foundation and admit this report and essentially just read Mr. Skelcy's conclusion."

¶ 34    The State responded that it did not need to admit the physical two-page laboratory report that provides the outcome of Skelcy's testing. The State asked to qualify Earl as an expert "provided we lay the proper foundation and that we discuss her review of Mr. Skelcy's report, all the other documents supporting it, so that she can testify as to what *** the machine generated result is." The trial court asked whether the confrontation would consist of Earl's expert opinion as to what she observed in the report. The State acknowledged that the confrontation would consist

of what Earl observed in Skelcy's report. Defendant then expressed concern regarding whether the expert could formulate an opinion without the State having laid a proper foundation for Skelcy's laboratory report. The court questioned whether the laboratory report could be admitted under the business records exception to the hearsay rule. The State responded that because Earl would be testifying as an expert under Illinois Rule of Evidence 703 (eff. Jan. 1, 2011) and her opinion is the type reasonably relied upon by experts in a particular field, "the facts or data need not be admissible in evidence." Defendant argued in reply that Earl should not be allowed to testify about the conclusion of Skelcy's report, even if the State could lay the foundation.

¶ 35    The trial court then stated:

> "[W]e obviously link this information to [defendant], it's going to be that the police officer's going to say we retrieved these items from [defendant], they were given to the State lab. They were then processed.
>
> So she's going to talk about who they were processed by and everything else and the tests that were run and the ordinary course of what that is.
>
> And then she's going to give an opinion that these tests were done correctly and that the result that was given is a correct result?"

¶ 36    The State responded, "yes." Defendant then stated, "I don't think she can testify as to this is what we received. The only knowledge she has of that is in the report that the State's referring to [which is] not an opinion at that point." Defendant argued that if the substance of Earl's opinion testimony is derived from Skelcy's laboratory report, "I don't think she can give personal knowledge testimony about the things that occurred." The trial court took a recess to consider the parties' arguments.

¶ 37    Upon return, the trial court ruled as follows:

"If Ms. Earl is able to be qualified as an expert in this particular field, she will be allowed to testify as to review of the report as well and the findings in the report.

You'll be able to cross-examine, [defense counsel], but I do believe that she's able to [testify] in her role as an expert [and] be able to review and give an opinion as to the content on there but she has to be qualified as an individual able to do that.

Assuming that happens, she will be able to provide that information."

The parties agreed that the State's attempt to qualify Earl as an expert would be done outside the presence of the jury.

¶ 38                                    B. Trial

¶ 39    As its first witness, the State called Officer Damian Wilk of the Carpentersville Police Department. On January 8, 2020, at approximately 11:58 p.m., Officer Wilk was stationed at the Fox View Apartment Complex, which he described as a "parking lot with a building right by the side and it's one row that leads in and outside of the complex." He observed a vehicle driving southbound on Oxford Drive with "what appeared to be [the] right passenger headlight out." Officer Wilk further stated that the vehicle "was driving with its parking lights only on," which was also considered to be a driving violation. Officer Wilk testified that this was a basis to initiate a stop of defendant's vehicle and issue a citation. After he observed the violation, Officer Wilk pulled behind the vehicle on Oxford Road. At that point, he did not suspect that the driver of the vehicle was under the influence of drugs or alcohol. Officer Wilk then observed the vehicle pull over to the curb before he activated his police lights. Officer Wilk described this conduct as "odd" because the driver of the vehicle "already knew that I was going to pull [him] over." Officer Wilk did not activate his police lights and the vehicle pulled away from the curb and made a left turn

onto Kings Road. After the vehicle made the left turn, Officer Wilk activated his overhead emergency lights and initiated a stop of the vehicle.

¶ 40    Officer Wilk stated that he got out of his car and approached the vehicle from the driver's side. The State then presented without objection State's exhibit No. 1, the recorded video of the January 8, 2020, vehicle stop from the dashboard camera affixed to Officer Wilk's squad car. After the jury viewed the video, Officer Wilk testified that, when he approached the vehicle, he "detected an odor of cannabis emitting from inside the vehicle." He stated that the smell of cannabis became stronger as he approached the vehicle.

¶ 41    Defendant was the only person inside the vehicle. Officer Wilk identified defendant in open court. Officer Wilk asked defendant if he had any cannabis inside the vehicle. Defendant specifically told Officer Wilk that "he had a blunt." Officer Wilk described a "blunt" as "a cigar wrapper that's wrapped with marijuana inside" and clarified that marijuana is commonly known as cannabis. Defendant told Officer Wilk that he had been smoking with his family because it was his birthday.

¶ 42    Officer Wilk then asked defendant to step out of the vehicle due to the odor of cannabis emitting from inside and defendant complied. Officer Wilk detained defendant for possession of cannabis by a driver, which is a Class A misdemeanor and an arrestable offense. Defendant voluntarily gave Officer Wilk a clear plastic bag with the suspected cannabis. The State asked Officer Wilk, "[h]ow do you know this is cannabis?" Officer Wilk replied, "[b]ased on my training and experience being a police officer, I determined it to be cannabis." The small plastic bag defendant gave the officer was neither sealed nor odor proof.

¶ 43    Officer Wilk also detected an odor of alcohol emitting from defendant's breath as he exited the vehicle. He asked defendant if he had consumed alcohol and defendant responded that he did.

Officer Wilk observed an open bottle of liquor in the back seat of the vehicle. The bottle was three-fourths full. The State presented an exhibit without objection depicting a picture of the liquor bottle Officer Wilk retrieved from defendant's vehicle.

¶ 44 The State next presented State's exhibit No. 4, which was admitted into evidence without objection and published to the jury. State's exhibit No. 4 is the dashboard camera video footage depicting what occurred after Officer Wilk stopped defendant's car.

¶ 45 The trial court also admitted over defendant's objection the plastic bag containing suspected cannabis that defendant gave Officer Wilk. Officer Wilk testified regarding chain of custody of the suspected cannabis he recovered.

¶ 46 Next, Officer Wilk testified that he transported defendant to the Carpentersville Police Department for possession of cannabis and to perform standard field sobriety tests. He stated that he did not perform the field sobriety tests after stopping defendant's vehicle because that location was on an incline. Officer Wilk took defendant into a booking room to perform the tests. Defendant voluntarily submitted a breath test, which resulted in a 0.027 breath alcohol content score. Based on Officer Wilk's observations during the sobriety testing and defendant's admissions that he had smoked marijuana and drank alcohol, Officer Wilk proceeded to arrest defendant.

¶ 47 After his arrest for DUI, Officer Wilk placed defendant in an interview room. Defendant did not ask to use the restroom. Officer Wilk left the room for approximately three minutes and, upon his return, observed defendant urinating on the "furnace." Officer Wilk saw urine on the floor and on the furnace. He advised defendant that he would be charged with criminal damage to property. Officer Wilk also stated that he could smell the urine. According to Officer Wilk, a cleaning company was contacted to clean the urine. Finally, Officer Wilk testified that in his

opinion, defendant was under the influence of alcohol and drugs on January 8, 2020, and was unfit to operate a motor vehicle.

¶ 48    On cross-examination, Officer Wilk testified that the area he was patrolling on January 8 is considered to be a "high crime area." When defendant drove by Officer Wilk's position, he believed that defendant's right headlight was out. He reiterated, "[i]nitially when [defendant] was driving by I observed one headlight out." Defendant pulled over without Officer Wilk initiating a traffic stop. At that point, Officer Wilk did not observe the front of defendant's vehicle and again repeated his belief that one headlight was out. Officer Wilk allowed defendant to continue driving. Defendant approached a stop sign. He did not swerve or leave his lane and made a full stop at the stop sign. Defendant signaled for a left turn and yielded for an oncoming driver. After defendant turned left, Officer Wilk initiated the traffic stop.

¶ 49    When Officer Wilk approached defendant's vehicle, he told defendant that his headlight was out. Defendant responded that his headlights were on. Officer Wilk walked to the front of defendant's vehicle and observed that both headlights were on. Officer Wilk testified that defendant did not have a headlight out. Defense counsel asked, "[i]t's your testimony that the lights we saw coming from [defendant's] vehicle were his parking lights?" Officer Wilk responded, "I believe he turned them on after I pulled out of my position." Officer Wilk acknowledged that the dashboard video did not capture whether defendant's parking lights were on before he pulled over defendant.

¶ 50    Officer Wilk testified that defendant told him that he had smoked marijuana earlier in the day but not while he was driving. Officer Wilk acknowledged that it was legal for defendant to smoke marijuana at home. He also acknowledged that the smell of alcohol alone does not necessarily indicate if someone is impaired. Defendant did not have any slurred speech, tremors,

bloodshot eyes, drowsiness, or balance issues when he exited his car. Officer Wilk also testified that to his knowledge, he was not aware of any damage to the furnace after he saw defendant urinate on it.

¶ 51    On redirect examination, Officer Wilk testified that, prior to stopping defendant's vehicle, he was never in front of it. The first time Officer Wilk actually went to the front of defendant's vehicle to see whether both headlights were on occurred only after he pulled over defendant.

¶ 52    Next, outside the presence of the jury, the State sought to qualify Earl as an expert witness in the field of drug chemistry. Earl testified that she has served as a forensic scientist with ISP for 28 years. She analyzed unknown compounds, tested them for the presence of controlled substances, and relayed the results "to any triers of fact." Earl testified regarding the training she received to be a drug chemist and that she received specialized training in testing and analyzing cannabis. Earl stated that during her 28-year career, she chemically analyzed and determined substances to be cannabis "thousands of times," as part of her general duties. She stated that she had been qualified to testify as an expert in drug chemistry analysis, including cannabis analysis, more than 100 times. The State then moved to qualify Earl as an expert in the field of drug chemistry.

¶ 53    Defendant next questioned Earl regarding her qualifications as an expert. Defense counsel asked Earl whether, during her 28 years as a drug chemist, she had ever testified as "an expert as to someone else's notes." Earl responded, "[n]o." Earl had testified as an expert regarding test results that only she herself had completed. The trial court found that Earl was qualified as an expert in drug chemistry.

¶ 54    Defendant then noted that Earl was disclosed not as an expert witness, but as a peer reviewer, the day of trial. Defense counsel stated, "if she's not being called as an expert in peer

review, then I have not received any information with regard to what she's going to be testifying to today." The State responded that "there is no such thing as an expert in peer review" and that Earl was qualified in the particular field of drug chemistry. Citing *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the State argued that an expert should be allowed to testify regarding the peer review of the initial analyst who is unable to testify at trial, as long as the person is qualified as an expert in the field to discuss the peer review. The trial court stated, "that's my understanding as well."

¶ 55    Defense counsel questioned Earl further, outside the presence of the jury. Earl stated that every case requiring drug chemistry analysis is subject to peer review. She explained that peer review encompasses the "review of the report that's generated, the worksheet that's generated, all of the data, and the results of the testing." A peer reviewer is not present when the sample is actually tested. Earl agreed that there is no way for a peer reviewer to become aware of any issues with the testing itself if it is not notated in the laboratory report. Earl then testified regarding Skelcy's education, training, and qualifications, stating, "I know he went through the same training." Earl stated, "during the 28 years that he was employed, he and I worked together all [but] 4 of those, so I can speak to [Skelcy's] training for about 24 of those years."

¶ 56    After questioning Earl, defendant objected to her ability to testify as to the contents of the report because, "if there were issues in the testing of that sample, she would not be able to tell that from the report given." The State responded that Earl reviewed the data generated in the report and that there was no indication in Skelcy's report of any error. Defendant replied, "I don't know necessarily that they would put in blaring letters that there is an error with this test. That would be something for the drug chemist to be able to testify to establish." The trial court overruled defendant's objection and clarified that Earl would be able to testify regarding the peer review of

Skelcy's report and "anything that falls within the expert qualification that she's been given." The court stated to defense counsel, "[y]ou'll be able to cross examine her. I think right now this goes more to weight versus admissibility."

¶ 57    Earl testified on direct examination that she knew Skelcy for 28 years and had worked with him at the ISP laboratory. According to Earl, "[e]very case that's analyzed by a forensic scientist is reviewed by another forensic scientist before it's issued to the agency." Earl had peer reviewed Skelcy's laboratory report in this case. She described the peer review process to the jury as follows:

> "In a case, we take notes as we analyze the evidence on a worksheet. So every test you do, you document what the test was and what the result was on a worksheet.
>
> And then some of the testing creates computer generated data. That computer generated data is added to the worksheet to be *** the notes packet. And those together generate a *** report.
>
> All of that together is sent to a peer reviewer. As a peer reviewer, you look at the notes, the data, and you verify that the data and the notes of the testing correspond to the [finding] that's being made and that it's supported."

¶ 58    Earl reviewed the worksheet created by Skelcy, which included two tests that Skelcy had performed. She reviewed the data from the worksheet and documentation of the result from the testing of "plant material." The State asked Earl, "[b]ased on your review of Mr. Skelcy's work along with the documents, what did he identify that plant material to be?" The trial court overruled defendant's objection, and Earl answered that Skelcy "identified the plant material as cannabis with Delta-9 THC."

¶ 59    Next, Earl described the peer review checklist she completes electronically. Earl stated, "there is an electronic form that I fill out where I answer questions that I reviewed these things and

then I electronically sign it and it creates what's called a peer review checklist." The State presented State's exhibit No. 10, which consisted of Earl's peer review checklist that she claimed to generate in this case. Earl explained that she sought a minimum of two positive tests to support the conclusion of the analyst and that, in this case, there were two positive tests. The peer review checklist also included a review of whether "all identifications/indications [are] reported accurately," which Earl reported, "[y]es." The checklist was signed by Earl but not dated. The bottom of the pages of the checklist state that it was printed on December 18, 2023. State's exhibit No. 10 was admitted into evidence without objection.

¶ 60    The State then asked Earl questions regarding chain of custody and the testing process in this case. The State presented State's exhibit No. 2, the evidence bag containing the cannabis defendant gave to Officer Wilk, which had already been admitted into evidence. Earl stated that she did not test the contents of what was contained in State's exhibit No. 2 and had never seen the material within until the State presented it to her at that very moment for purposes of testifying regarding chain of custody. The State asked Earl whether the analyst cuts open the bag to test the material and whether that is what happened in this case. Defendant objected based on speculation and the trial court overruled the objection. Earl described the markings of individuals who touched the evidence bag while it was in police custody, which included Skelcy's markings. She stated that she was very familiar with Skelcy's initials and that he had put his initials in logbooks that are shared among colleagues. Earl continued that every time an evidence bag is sealed, "we're supposed to put our initials, case number, date, and exhibit number," which is what she saw on the seal of the evidence bag on State's exhibit No. 2.

¶ 61    Earl also described the policy and procedure of the ISP crime laboratory for marking a sample that has been tested. She explained that samples must be marked and that "if you were to

have a pipe, you might just put your initials and date on the pipe. But on plant material, it's easier to put it into a plastic bag and mark the plastic bag." When the State asked Earl whether the markings on the bag in State's exhibit No. 2 reflected that Skelcy had completed testing of the substance contained within, defendant objected and the trial court overruled the objection. Earl stated that, in her opinion, she saw "consistencies between this exhibit and the file I approved that lead me to believe this is the evidence that corresponds to the file that I approved." She testified that the agency sticker on the evidence reflected that the substance "came to the crime lab from the Carpentersville Police Department." The file in this case displayed the chain of custody, showing that Skelcy received the evidence on May 26, 2020. Based on the information Earl reviewed, she did not see any abnormalities in the policies and procedures involving chain of custody.

¶ 62    Earl testified that, based on Skelcy's worksheet, Skelcy opened the file on May 28, 2020, to test the material. The State asked Earl what happens when a forensic scientist is not actually working with a particular sample, "where is that sample?" Earl responded that, "generally the evidence is in a vault or locked cabinet," but if the evidence is "pulled out for some reason and we need to step [away], I would personally put it in a locked cabinet." However, she did not know whether that happened in this case. She explained the testing process, which included weighing the material and performing either a mass spectrometry or a gas chromatography. In this case, Skelcy performed a "Duquenois-Levine and gas chromatography mass spectrometry," a chemical test which Earl described in great detail. Earl testified that, based on her review of Skelcy's test, a positive result for cannabis was obtained, because his worksheet noted a "purple purple" outcome.

¶ 63    Next, the State presented State's exhibit No. 11, which was "an electronic version of [Skelcy's] worksheet and then three data pages" reflecting the chemical testing. The State asked

Earl how she knew that the documents consisting of Skelcy's worksheet "relate to the case that we're currently talking about?" Earl responded, "[a]ll I know is that they have the case number that associates with the evidence on it." Defendant objected to the admission of State's exhibit No. 11 based on previous argument and the trial court overruled the objection. Earl testified that she peer reviewed the data contained in State's exhibit No. 11 and that the data generated after testing cannot be altered. The State asked, "[w]hen you reviewed the data, did you review it from the original of that document or did you review it from the machine used by the person who did the analysis?" Earl replied, "our computer system has this documentation loaded up into it. And then I get an electronic version of the file and so I reviewed the electronic version of the file."

¶ 64      The State then presented State's exhibit No. 12, Skelcy's laboratory report containing his findings. When the State asked Earl to testify about the findings listed in the report, defendant objected and the trial court sustained the objection. The State then asked, "[b]ased on looking at the lab report, the notes[,] and the data, were you able to form a conclusion as to what the substance contained in People's Exhibit No. 2 that was tested was?" When Earl attempted to answer that she agreed the work had been done to support the findings reported by Skelcy, defendant objected based on hearsay, violation of the confrontation clause, lack of personal knowledge, and lack of foundation. The court overruled the objection and Earl confirmed that Skelcy found the plant material tested was cannabis. She stated, "[b]ased on the notes and the worksheet, I was able to agree that the work had been done to support findings reported by Mr. Skelcy." State's exhibit No. 12 was admitted over defendant's objection. Finally, the State asked Earl whether her testimony was "consistent with your peer review findings back when this was peer reviewed?" Earl answered in the affirmative.

¶ 65    On cross-examination, Earl testified that she was not the forensic scientist who tested the sample in this case. She agreed that this was her first time testifying regarding another forensic scientist's notes. When asked whether she was present when Skelcy tested the sample, Earl responded, "I don't know the answer to that." Earl agreed that if an error had occurred during the testing process that was not noted in Skelcy's laboratory notes, she would not be aware of it. Her peer review was based on Skelcy's laboratory notes, the notes packet, and his report.

¶ 66    After Earl's testimony, defendant moved for directed verdict. The trial court granted defendant's motion with respect to the illegal transportation of alcohol. The court denied defendant's motion on the remaining counts of DUI, criminal damage to property, and unlawful possession of cannabis by a driver, finding that, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find defendant guilty beyond a reasonable doubt. The defense then rested without presenting evidence.

¶ 67    The jury returned verdicts of guilty of criminal destruction of property and unlawful possession of cannabis by a driver but returned a verdict of not guilty of the combined DUI charge.

¶ 68                              C. Posttrial and Sentencing

¶ 69    On January 19, 2024, defendant moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. Defendant argued that the trial court erred when it denied his motion to bar Earl's testimony because the State failed to disclose her as a witness in violation of Rule 415(b). Defendant contended, among other things, that the admission of Earl's testimony and Skelcy's laboratory report violated his rights under the confrontation clause. In addition, defendant challenged the sufficiency of evidence for the guilty finding of criminal damage to property.

¶ 70    On March 8, 2024, the trial court heard defendant's motion. Defendant argued that his rights under the confrontation clause were violated as follows:

"[Earl's] statements, what she's testifying to at the testimonial statement here [referring to Skelcy's laboratory report], the declarant of that statement would have been Mr. Skelcy who was unavailable and certainly not being contested here. He was unavailable to testify and he was not available for any cross-examination prior to that, so the statements that he made specifically about the testing came in, and he was not subject to cross-examination. That is a violation of the Defendant's right to confront any witnesses against him [and] I think that this was extremely prejudicial given that that was one of the elements of the charge that [defendant] was found guilty of, that the State needed to prove the substance that was recovered from [defendant] was, in fact, cannabis and the fact that this came in was clearly prejudicial as the Jury came back with a guilty verdict for that charge."

¶ 71    The trial court stated,

"then is the argument, then, that the person that does the lab test then passes away, as it happened here, there's no way to get that evidence in then? It's a windfall for the Defendant, even though it was tested, the procedure was followed, it's a business record, you just can't get it in at that point because the person passed away?"

Defendant responded:

"Well, I think that there would be other ways for the State to try to get new lab reports in. They did present the cannabis itself at the trial, so they had the cannabis in their possession and it could have been sent in for re-testing at that point. *** I don't think that the Sixth Amendment is here to protect the State's right to try a Defendant, it's to protect the Defendant from unfair prosecution at that point, to allow him to confront any witnesses against him. Here, Miss Earl testified that she was not present when the testing was completed. She testified that if an error happened during the testing, she would not have

any knowledge of that; so essentially, we had to circumvent any potential cross-examination about issues that could have happened or issues that Mr. Skelcy actually encountered when he did this testing. We don't know any of that and instead, the results came in without that cross-examination."

¶ 72 Following argument, the trial court found that Earl's "peer review was proper, [and] the admission of the [laboratory report] was proper." The court then stated that, as to the criminal damage to property finding, "all of those arguments were made in front of the Jury, they had the instructions, they were able to make a determination as to whether or not urinating on it was damage or not, and they came to the conclusion they did." The court denied defendant's motion and sentenced him to 12 months' court supervision, concurrent with additional requirements including an order to pay fines. This appeal followed.

¶ 73                                   II. ANALYSIS

¶ 74 Before addressing the merits of this appeal, we initially note that defendant was charged by complaint on January 8, 2020, and he filed a speedy trial demand on September 28, 2020. This case, which charged defendant with Class A misdemeanors, took nearly four years to get to trial. Skelcy completed his forensic report on June 4, 2020. The first time both parties answered ready for trial was on January 20, 2022, but the case was continued the following day. The trial court set trial dates of September 6, 2022 (defendant answered not ready), February 21, 2023 (defendant answered not ready), and September 12, 2023 (Skelcy had passed away and the State moved to continue). The parties are partially responsible for the lengthy delay of the trial of what should have been a simple misdemeanor case. Defendant here does not argue that his right to a speedy trial was violated, as he answered not ready for trial on multiple occasions. See *People v. Cross*, 2022 IL 127907, ¶ 20 (a delay attributable to a defendant tolls the speedy trial statute). However,

commencing a trial with nearly a four-year delay for misdemeanor violations frustrates the purpose of section 103-5(a) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure), namely, the Speedy Trial Act. 725 ILCS 5/103-5(a) (West 2020). We admonish the parties to adhere to the tenets of the Speedy Trial Act, whether or not defendant was in custody and whether or not he was charged with misdemeanor violations.

¶ 75    Furthermore, the trial court ultimately is responsible for managing its calendar and, therefore, we also attribute the lengthy delay of the resolution of this matter to the trial court. " 'To enable just and efficient resolution of cases, the court, not the lawyers or litigants, should control the pace of litigation.' " William F. Dressel, *Court Organization and Effective Caseflow Management—Time to Redefine* 1 (2010), https://www.judges.org/wp-content/uploads/2020/03/ Time-to-Redefine.pdf [https://perma.cc/S923-VXLM] (quoting Nat'l Conf. of State Trial Judges, *Standards Relating to Court Delay Reduction* § 2.50 (Am. Bar Ass'n 1985)). This idea is not a new one and it underpins the Illinois Supreme Court's adoption of time standards for cases filed after January 1, 2022, which "represent the time during which the court exercises control over and is accountable for the progress and timely closure of a case." Ill. S. Ct., M.R. 31228 (eff. July 1, 2022). The supreme court's time standards were based upon its careful study of the time needed for the trial courts to meet "their fundamental obligation to resolve disputes fully, fairly, and promptly." *Id.* It suffices to say that had the standards been in force for this case, they would not have been met, but laying the responsibility for delay solely on the parties is inaccurate. The courts are accountable "for the progress and timely closure of a case." *Id.*

¶ 76    Turning to the merits, defendant argues on appeal that his confrontation clause rights were violated when the trial court erred by: (1) admitting the forensic laboratory report under the business records exception to the hearsay rule when the author of the report was unavailable at

trial due to his passing; and (2) allowing an expert to testify to the conclusion of the report as a surrogate for the deceased author. Defendant further claims the court abused its discretion when it failed to remedy the State's late disclosure of the identity of the expert witness immediately before trial. He also challenges the sufficiency of the evidence for his conviction of criminal damage to property. In addition, defendant argues that he was denied his right to effective assistance of counsel for failure to move to suppress the evidence recovered after an alleged illegal traffic stop under the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and *Terry v. Ohio*, 392 U.S. 1 (1968). Finally, defendant contends that he was denied a fair trial when the court improperly instructed the jury on the charge of unlawful possession of cannabis by a driver.

¶ 77　　In our view, the determinative issues are whether defendant's confrontation clause rights were violated and whether the State presented sufficient evidence to convict defendant of criminal damage to property. We address each issue in turn.

¶ 78　　　　　　　　　　A. Violation of Confrontation Clause

¶ 79　　Defendant first argues his right to confront witnesses against him was violated when the trial court: (1) admitted a laboratory report prepared for investigation under the business records exception to the hearsay rule; and (2) allowed a surrogate analyst to testify to the report's conclusions as an expert in the place of the deceased author. Defendant contends that the admission of the laboratory report and allowing Earl's testimony were errors that prejudiced him. He maintains that the report is hearsay that does not fall into any exception because it was testimonial in that it was prepared in anticipation of a criminal investigation. Defendant argues that the confrontation clause bars testimonial hearsay if the defendant does not have an opportunity to cross-examine the declarant. In this case, defendant claims that, because Skelcy was unavailable to testify at trial, the admission of his report violated defendant's right to confront the witness and,

thus, should have been excluded. Defendant contends that Earl's testimony regarding the report's conclusions were improper because she did not give independent expert opinions and the State did not properly disclose her as an expert witness until the morning of trial. According to defendant, because the identity of the tested substance was at issue, these errors were not harmless. He seeks reversal of his conviction of unlawful possession of cannabis by a driver because the State lacks sufficient evidence to convict without the inadmissible testimony and exhibits.

¶ 80                                 1. Doctrine of Invited Error

¶ 81     We first address the State's invocation of the invited-error doctrine. The State responds that defendant invited the alleged errors when he declined the State's offer to continue the case to retest the alleged cannabis. The State notes that defense counsel admitted on the record that she did not believe the State was acting in bad faith when it offered Earl as a witness. However, defendant asserted that a continuance would not have been appropriate, because the case had been pending for nearly four years by that time and the State had previously answered ready to proceed to trial five times when Skelcy would have been alive to testify at any of those trials. The State argues that if the defense believed that it was not prepared to proceed at trial with Earl as a witness, it should have accepted the continuance. According to the State, a small additional delay would not have been impactful at that point. The State contends that its need for Earl's testimony "was very strong considering no one else was more qualified and available to testify to the cannabis testing." The State argues that retesting the substance "would have eliminated the entire controversy," but defendant rejected that solution. The State maintains that defendant's conduct "is the very conduct this Court seeks to prevent through the invited error doctrine because this tactic has deprived the People and the trial court of any opportunity to cure any perceived issue."

¶ 82    Under the doctrine of invited error, "it is well established that 'an accused may not ask the trial court to proceed in a certain manner and then contend in a court of review that the order which he obtained was in error.' " *People v. Segoviano*, 189 Ill. 2d 228, 241 (2000) (quoting *People v. Lowe*, 153 Ill. 2d 195, 199 (1992)); see *People v. Abston*, 263 Ill. App. 3d 665, 671 (1994) ("where the trial court's course of action is taken at defendant's suggestion and the defendant thereafter acquiesces in the court's expressed course of conduct, the defendant should be precluded from raising such course of conduct as error on appeal"). The rationale behind this doctrine is that "it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). A typical scenario exemplifying the application of the doctrine occurs, for example, when defense counsel stipulates to the admission of expert testimony that the substance recovered from the defendant was cocaine (*People v. Bush*, 214 Ill. 2d 318, 321-22, 333 (2005)), or when a defendant on appeal challenges verdict forms that his own counsel submitted at trial (*People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)).

¶ 83    The doctrine of invited error is inapplicable here because defendant did not acquiesce to the trial court's expressed course of conduct when the court admitted Skelcy's laboratory report and allowed Earl to testify to the report as an expert witness. *People v. Collins*, 2020 IL App (1st) 181746, ¶¶ 16-18 (rejecting the State's claim that the defendant invited the admission of body camera video later claimed as error on appeal where the record demonstrated that the defendant never acquiesced to the admission of the video and consistently objected to its admission). In this case, defense counsel (1) filed a motion to bar Earl's testimony, albeit in the context of seeking sanctions for a discovery violation, and (2) objected to the admission of Skelcy's report and Earl's proposed testimony as violative of the confrontation clause before, during, and after trial in a

posttrial motion. Defendant also objected to the State's offer to retest the material, arguing, "I understand that [Skelcy] passed away late August or early September. The State could have at that point sent the sample off to be retested if there was a sample that was able to be retested." In short, defendant opposed both Earl's testimony and the admission of the report and, therefore, could not have invited any error therefrom.

¶ 84    "The right to due process, as guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2), safeguards an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary to prove each element that constitutes the crime charged." *People v. Murray*, 2019 IL 123289, ¶ 28. "An essential element of proof to sustain a conviction cannot be inferred but must be established." *Id.* Further, "[i]t is axiomatic that the State carries the burden of proving each element of a charged offense beyond a reasonable doubt" and that "burden rests on the State throughout the entire trial and never shifts to the defendant." *Id.* (citing *People v. Howery*, 178 Ill. 2d 1, 32 (1997)). "Therefore, the defendant is under no obligation to produce any evidence, and the burden of proof never shifts to the defendant but remains the responsibility of the State throughout the trial." *Id.*

¶ 85    In this case, the State maintained throughout the trial the burden of proof to establish the elements of unlawful possession of cannabis by a driver. *Id.* The evidentiary issues that arose in this case easily could have been remedied by the State in one of two ways. First, section 115-15(a) of the Code of Criminal Procedure provides that a forensic laboratory report like the one at issue in this case "that is signed and sworn to by the person performing an analysis" is considered "*prima facie* evidence of the contents, identity and weight of the substance." 725 ILCS 5/115-15(a) (West 2020). Here, if Skelcy had attached a notarized statement to his report as provided in section 115-15(a), his report simply would have been *prima facie* evidence unless the accused

"demands the testimony of the person signing the report by serving the demand upon the State's Attorney within 7 days from the accused or his or her attorney's receipt of the report." *Id.* § 115-15(c). The State tendered the report to defendant on December 1, 2021, and the record includes no demand from defendant for the author's testimony seven days from receipt. Regardless, Skelcy did not attach a notarized statement and, therefore, the report could not be considered *prima facie* evidence under section 115-15(a) of the Code of Criminal Procedure. Second, the State was well aware of Skelcy's death in August 2023 and, when it moved to continue the trial on September 5, 2023, it should have offered to retest the material to cure the evidentiary issues that we now consider on appeal. The State maintains the burden of proof. Therefore, we reject the State's argument that the doctrine of invited error applies here.

¶ 86     2. Evolution of Recent Confrontation Clause Jurisprudence

¶ 87 We next address defendant's claims that his confrontation clause rights were violated. Precedent on this issue has shifted recently, requiring a summary of pertinent authority.

¶ 88      a. United States Supreme Court Decisions

¶ 89 The sixth amendment to the United States Constitution, applicable to the states via the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amends. VI, XIV; see Ill. Const. 1970, art. I, § 8; *Crawford v. Washington*, 541 U.S. 36, 54 (2004); *Pointer v. Texas*, 380 U.S. 400, 403 (1965) (holding that the confrontation clause is applicable to the states via the fourteenth amendment). In *Crawford*, the United States Supreme Court held that, under the confrontation clause, the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. *People v. Patterson*, 217 Ill. 2d 407, 423 (2005) (citing *Crawford*, 541 U.S. at

68). The resolution of a confrontation clause violation claim under *Crawford* requires answers to the following questions:

> "(1) Was the out-of-court statement hearsay because it was offered for the truth of the matters asserted therein? (2) If hearsay, was the statement admissible under an exception to the hearsay rule? (3) If admissible hearsay, was the statement testimonial in nature? and (4) If testimonial, was admission of the statement reversible error?" *People v. Leach*, 2012 IL 111534, ¶ 63.

Whether a defendant's confrontation clause rights were violated presents a question of law reviewed *de novo*. *Id.* ¶ 64 (citing *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009)). Finally, violations under *Crawford* are subject to harmless-error analysis. *Patterson*, 217 Ill. 2d at 428.

¶ 90 After *Crawford*, the Supreme Court explained the difference between testimonial and nontestimonial statements in *Davis v. Washington*, 547 U.S. 813, 822 (2006):

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

The *Davis* Court recognized this last clause—"that the primary purpose *** is to establish or prove past events potentially relevant to later criminal prosecution"—could apply to out-of-court statements not made during police interrogations. *Id.* The Court limited its holding in this way because the statements at issue in *Davis* were made during police interrogations. *Id.* In a footnote,

however, the Court clarified that it did not mean to "imply *** that statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 822 n.1.

¶ 91    Subsequently, the Supreme Court has issued several opinions applying *Crawford* to the admission of forensic reports and testimony. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Court considered whether a certificate from a state laboratory attesting the substance analyzed was cocaine was testimonial hearsay when offered in evidence against a defendant charged with drug distribution and trafficking. The *Melendez-Diaz* Court, in a 5 to 4 decision, ruled the forensic analyst's certificates were within the " 'core class of testimonial statements' " in *Crawford. Id.* at 310 (quoting *Crawford*, 541 U.S. at 51). The Court found "[t]he 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " *Id.* at 310-11 (quoting *Davis*, 547 U.S. at 830). Indeed, under Massachusetts law, the sole purpose of the affidavit was evidentiary. *Id.* at 311. Accordingly, the Court concluded that the introduction of the certificate in violation of the confrontation clause was error under the holding in *Crawford.* See *id.* at 329 (citing *Crawford*, 541 U.S. 36). In sum, because the certificates were found to be testimonial, they could not be introduced into evidence unless the forensic analyst testified. *Id.* at 310-11.

¶ 92    The Supreme Court next decided *Bullcoming*, 564 U.S. at 656, wherein the defendant was found guilty of aggravated driving under the influence of intoxicating liquor. In anticipation of trial, Curtis Caylor, the forensic analyst assigned to test the defendant's blood sample, certified that the defendant's blood-alcohol concentration (BAC) was at a level that supported prosecution for aggravated DUI. *Id.* at 654-55. On the day of trial, the State announced that it would not be calling Caylor as a witness because he had been put on undisclosed, unpaid leave. *Id.* at 655. The defendant objected, complaining that the State had failed to disclose the surrogate witness and that,

"had [she] known that the analyst [who had tested the defendant's blood] was not available," the entire defense "may very well have been dramatically different." *Id.* The defendant argued that the introduction of the unavailable analyst's findings through a surrogate would violate his rights under the confrontation clause. *Id.* The trial court overruled the defendant's objection, admitted the BAC report as a business record, and allowed the testimony of Gerasimos Razatos, a forensic scientist who had neither observed nor reviewed Caylor's analysis. *Id.*

¶ 93    On review, the *Bullcoming* Court, relying on *Melendez-Diaz*, found that the certified BAC report, which was prepared "solely for an 'evidentiary purpose' " and made in "aid of a police investigation," was testimonial. *Id.* at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311). Therefore, its admission into evidence required either live testimony from the analyst who had performed the test and certified the report, or a finding that the analyst who performed the test was unavailable and that the defendant had a prior opportunity to cross-examine that analyst. *Id.* at 661-63.

¶ 94    The *Bullcoming* Court explained its concerns about "surrogate" testimony as follows:

"But surrogate testimony of the kind Razatos was equipped to give could not convey what Caylor knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part. Significant here, Razatos had no knowledge of the reason why Caylor had been placed on unpaid leave. With Caylor on the stand, [the defendant's] counsel could have asked questions designed to reveal whether incompetence, evasiveness, or dishonesty accounted for Caylor's removal from his workstation. Notable in this regard, the State never asserted that Caylor was 'unavailable'; the prosecution conveyed only that Caylor was on uncompensated leave. Nor did the State assert that Razatos had any 'independent opinion' concerning [the defendant's] BAC." *Id.* at 661-62.

¶ 95    Accordingly, *Bullcoming* stands for the proposition that the surrogate testimony of another analyst who did not personally conduct or observe the performance of the test was insufficient to satisfy the requirements of the confrontation clause. *Id.* at 652 ("The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.").

¶ 96    Shortly thereafter, the Supreme Court decided *Williams v. Illinois*, 567 U.S. 50, 79 (2012), wherein a plurality of the Court held that the defendant's confrontation rights were not violated when an expert witness testified that a DNA profile prepared by an outside laboratory, Cellmark, matched a profile that the State produced from a sample of the defendant's blood. Justice Alito authored the plurality opinion, joined by Chief Justice Roberts and Justices Kennedy and Breyer. *Id.* at 55. These four justices were the dissenters in *Melendez-Diaz* and *Bullcoming*. The *Williams* plurality found that the expert's testimony was not barred because Cellmark's report could be a basis for the expert's opinion and the trial court was presumed to have considered its admission for that purpose and not for the truth of the matter asserted. *Id.* at 77-79 ("[I]f the trial judge in this case did not rely on the statement in question for its truth, there is simply no way around the proviso in *Crawford* that the Confrontation Clause applies only to out-of-court statements that are 'use[d]' to 'establis[h] the truth of the matter asserted' " (quoting *Crawford*, 541 U.S. at 59 n.9)).

¶ 97    The *Williams* plurality also independently concluded that the admission of the actual DNA profile for its truth would not have violated the confrontation clause. *Id.* at 81-82. The plurality noted that in all but one of the post *Crawford* cases finding a confrontation violation, the abuses shared two characteristics: "(1) [t]hey involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (2) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id.* at 82.

"Thus, the plurality concluded in *Williams* that not all forensic reports offered by the State are testimonial statements." *Leach*, 2012 IL 111534, ¶ 118.

¶ 98   Justice Thomas concurred in the judgment in *Williams* and "agree[d] with the plurality that the disclosure of Cellmark's out-of-court statements through the expert testimony *** did not violate the Confrontation Clause." *Williams*, 567 U.S. at 103 (Thomas, J., concurring). He did not agree, however, with the plurality's rationale, instead reaching his conclusion "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' for purposes of the Confrontation Clause." *Id* at 103-04. (quoting *Michigan v. Bryant*, 562 U.S. 344, 378 (2011) (Thomas, J., concurring)).

¶ 99   Pertinent here, Justice Breyer authored a concurring opinion, writing that he would have preferred additional briefing and reargument to address broader questions regarding the general application of the confrontation clause to crime laboratory reports and underlying technical statements. *Id.* at 86 (Breyer, J., concurring). He posed the following concerns relevant to this appeal:

> "[A]ssume that the admissibility of the initial laboratory report into trial had been directly at issue. Who should the prosecution have had to call to testify? Only the analyst who signed the report noting the match? What if the analyst who made the match knew nothing about either the laboratory's underlying procedures or the specific tests run in the particular case? Should the prosecution then have had to call all potentially involved laboratory technicians to testify? Six to twelve or more technicians could have been involved. *** Some or all of the words spoken or written by each technician out of court might well have constituted relevant statements offered for their truth and reasonably relied on by a supervisor or analyst writing the laboratory report." *Id.* at 90.

¶ 100   The dissenting opinion in *Williams*, authored by Justice Kagan, raised similar concerns, stating that " '[w]hen the State elected to introduce' the substance of Cellmark's report into evidence, the analyst who generated that report 'became a witness' whom [the defendant] 'had the right to confront.' " *Id.* at 125 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, J.J.) (quoting *Bullcoming*, 564 U.S. at 663).

¶ 101                                    b. Illinois Supreme Court Decisions

¶ 102   Following the United States Supreme Court's precedent on this issue, our supreme court subsequently considered forensic evidence in the context of the confrontation clause in an attempt to harmonize the holdings from the Supreme Court decisions. In *Leach*, the defendant was convicted of first degree murder in the strangling death of his wife. 2012 IL 111534, ¶¶ 1-3. The autopsy report on the victim was admitted into evidence through the expert testimony of a medical examiner who had not performed the autopsy but had reviewed the autopsy report in forming her opinion on the cause of death. *Id.* ¶ 1. The appellate court affirmed the conviction, and the defendant further appealed to the supreme court. *Id.*

¶ 103   The *Leach* court addressed whether the medical examiner's testimony and the autopsy report she relied upon violated the defendant's rights under the confrontation clause. *Id.* ¶ 50. The court stated that, although *Crawford* "merely noted *** that business records will rarely implicate the confrontation clause because they are prepared in the routine course of the operation of the business activity or public office or agency, rather than for the purpose of admission against a criminal defendant," this does not mean that "a business record or public record can never be testimonial." *Id.* ¶ 81.

¶ 104   The *Leach* court then undertook an extensive examination of numerous decisions from the United States Supreme Court on this issue, including *Crawford*, *Williams*, *Davis*, *Melendez-Diaz*,

*Bryant*, and *Bullcoming*. *Id.* ¶¶ 77-135. Noting at one point the need to provide a "scorecard" to reconcile the various plurality opinions, partial concurrences, and partial dissents (*id.* ¶ 105), our supreme court expressed hope that the "split of opinion and *** confusion *** may eventually be resolved by the United States Supreme Court" (*id.* ¶ 136). Nonetheless, the *Leach* court held that

> "under the objective test set out by the plurality in *Williams* [*i.e.*, whether the primary purpose was to accuse a targeted individual of criminal conduct], under the test adopted in *Davis* [whether the primary purpose was to provide evidence in a criminal trial], and under Justice Thomas's 'formality and solemnity' rule [finding affidavits, depositions, confessions, and prior testimony subject to *Crawford*], autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial,"

including those reports that are prepared by a medical examiner who is "aware that police suspect homicide and that a specific individual might be responsible." *Id.*

¶ 105   The *Leach* court concluded that the autopsy report "did not bear testimony against the defendant" because it did not directly link him to the crime and was, therefore, nontestimonial. *Id.* ¶¶ 132, 137. Relevant here, the court also stated that, "while it is true that an autopsy report might eventually be used in litigation of some sort, either civil or criminal, these reports are not usually prepared for the sole purpose of litigation." *Id.* ¶ 130. Similarly in *People v. Barner*, 2015 IL 116949, ¶¶ 63-64, our supreme court concluded that a DNA profile, much like the one at issue in *Williams*, was not testimonial.

¶ 106                    c. Illinois Appellate Court Decisions

¶ 107   Finally, three more recent decisions in this court are relevant to the disposition of the instant appeal. First, in *People v. Lewis*, 2019 IL App (1st) 160864, ¶¶ 1, 29-30, the defendant claimed that his sixth amendment confrontation rights were violated. There, the State presented the

conclusions of one firearms identification expert through a surrogate expert, who did not do the testing that led to those conclusions. *Id.* ¶ 1. Kurt Zielinski, an ISP forensic scientist and an expert in firearms identification, testified that another forensic scientist, Leah Kane, completed the firearms identification examination, but at the time of trial was on medical leave. *Id.* ¶ 17. Zielinski testified that he reviewed Kane's results and her case file, and also did " 'some of the verification,' " finding that she had " 'followed all procedures in a proper manner.' " *Id.* He also testified that Kane's examination concluded that the ammunition recovered from the crime scene was fired from the handgun recovered by police officers who witnessed the defendant drop the weapon. *Id.* ¶ 22. Following the defendant's conviction at trial for aggravated discharge of a firearm, he argued on appeal that the State violated his right to confront witnesses against him by calling Zielinski to testify about Kane's conclusions, leaving him with no opportunity to cross-examine Kane. *Id.* ¶ 29.

¶ 108   The *Lewis* court found that Kane's report "*was* prepared with a targeted individual in mind, [the defendant], and for the purpose of providing evidence in the criminal case against him." (Emphasis in original.) *Id.* ¶ 44. The court also found that, although the parties did not raise the issue, the testimony "was hearsay that does not fall within any hearsay exception of which we are aware." *Id.* ¶ 45 (citing multiple Illinois evidentiary rules). The court concluded that Zielinski "was clearly testifying to Ms. Kane's opinions and conclusions and offering those for the truth of the matter asserted. Such surrogate testimony is simply not admissible, regardless of whether the lab report on which Mr. Zielinski based his testimony was itself testimonial under *Crawford*." *Id.* Ultimately, however, the defendant had failed to object to Zielenski's testimony at trial and, although the reviewing court found the defendant's confrontation rights were violated, it affirmed his conviction because the error did not "rise to the level of plain error in this case." *Id.* ¶ 48.

¶ 109   Next, in *People v. Solomon-Bey*, 2021 IL App (2d) 190742-U, ¶ 2, the defendant argued on appeal that he was deprived of his right to a fair trial because he could not confront the expert who prepared the laboratory test result used to convict him.[4] Coincidentally, the surrogate forensic scientist who testified in the *Solomon-Bey* case was Skelcy, the same forensic scientist who tested the alleged cannabis in this case, who conducted testing for controlled drug buys involving the defendant on December 8, 2016, and December 13, 2016. *Id.* ¶ 11. At trial, however, Skelcy also testified that he had reviewed a report from Sara Anderson, another ISP forensic scientist, who analyzed a substance recovered during a December 20, 2016, purchase. *Id.* ¶ 12. Skelcy identified Anderson's report, described that Anderson tested a " 'chunky powder' " that weighed 0.8 grams, and explained how he performed the same tests as Anderson on the samples from December 8 and December 13. *Id.* "Based on his training and experience, Skelcy agreed with Anderson's findings that the sample contained cocaine." *Id.* The jury found the defendant not guilty of the count related to the December 8 sale, but guilty on the remaining counts. *Id.* ¶ 14.

¶ 110   Similar to the defendant in *Lewis*, the defendant in *Solomon-Bey* failed to preserve this error for review and sought review of the issue under plain error. *Id.* ¶ 17. The *Solomon-Bey* court found that Anderson's report was clearly "testimonial" because when she tested the substance, the defendant was being " 'targeted' " for prosecution and the testing was conducted for the purpose of proving his guilt at a subsequent trial. *Id.* ¶ 29 (quoting *Williams*, 567 U.S. at 84) (plurality opinion). This court rejected the defendant's challenge of Skelcy's surrogate expert testimony because the State argued in the alternative that any error in admitting Skelcy's testimony was

---

[4]Although this disposition was filed on September 9, 2021, under Illinois Supreme Court Rule 23(b) (eff. Feb. 1, 2023), "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

harmless. *Id.* ¶ 31. The court, following *Lewis* and discounting the surrogate testimony, found harmless error and concluded that "the circumstantial evidence was sufficient to prove that the substance delivered on December 20 by defendant was cocaine beyond a reasonable doubt." *Id.* ¶ 39 ("[C]onfrontation clause violations are subject to a harmless-error analysis.").

¶ 111    Finally, in *People v. Conway*, 2023 IL App (1st) 172090-U, ¶¶ 1-2, the defendant was found guilty of being an armed habitual criminal and, in one of his arguments on appeal, claimed a confrontation clause violation.[5] There, police found seven spent shell casings at the crime scene, swabbed the defendant's hands and clothing, and sent the swabs to the lab for testing. *Id.* ¶ 3. Scott Rochowicz, an expert on trace chemistry, testified as a surrogate for Robert Burke, the forensic scientist who tested the swabs. *Id.*. Burke prepared the forensic report documenting his conclusions, but the defendant had no opportunity to cross-examine him because he did not testify at trial. *Id.* Instead, Rochowicz testified without limitation about his review of Burke's notes, report, and conclusions, and stated that he agreed with Burke's conclusions. *Id.* ¶ 18. The *Conway* court found that Burke's conclusions were testimonial "regardless of whether they are analyzed for the primary purpose of accusing a specific suspect or developing evidence to use at trial more generally." *Id.* The court held that Rochowicz's surrogate expert testimony violated the defendant's rights under the confrontation clause. *Id.* ¶ 19. In addition, the court found plain error occurred because the evidence was closely balanced and, therefore, "the clear error of admitting Rochowicz's testimony in violation of [the defendant's] Confrontation Clause rights constituted first-prong plain error, and accordingly we vacate his conviction and remand for a new trial." *Id.*

---

[5]Similar to *Solomon-Bey*, this disposition was filed after January 1, 2021, under Rule 23(b) and, therefore, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

¶ 23. The court noted that there were no double jeopardy issues on remand because the evidence was sufficient to sustain the conviction despite being closely balanced. *Id.*

¶ 112   We now turn to the most recent United States Supreme Court precedent, which ties all these cases together and clarifies the confusion sown in courts across the country following the fractured disposition in *Williams*, 567 U.S. 50 (discussed *supra* ¶¶ 96-100).

¶ 113                                    d. *Smith v. Arizona*

¶ 114   The United States Supreme Court in *Smith v. Arizona*, 602 U.S. 779, 783 (2024), determined whether a confrontation clause violation occurs when a surrogate expert conveys an absent analyst's testimonial statements for the truth of the matter asserted and in support of the surrogate's opinion to prove the results of the absent analyst's forensic testing. *Smith* involved drug testing much like the instant case. There, police executed a search warrant of a property and found the defendant inside a shed with a large quantity of drugs. *Id.* at 789. The defendant was charged with possessing for sale methamphetamines, marijuana, and cannabis, along with possession of drug paraphernalia. *Id.* In preparation for trial, the prosecution sent the seized items to a State-run laboratory for testing. *Id.* Forensic scientist Elizabeth Rast conducted the testing, prepared a typed set of notes, and signed a report with the laboratory's letterhead, documenting her lab work and results. *Id.* at 790. Three weeks before trial, the State replaced Rast with a different forensic analyst as its expert witness because Rast had stopped working at the laboratory. *Id.* The State amended its final pretrial conference statement to add a " 'substitute expert,' " forensic scientist Greggory Longoni. *Id.* The State's pretrial statement provided that Rast would not be called as a witness but Longoni " 'is expected to have the same conclusion.' " *Id.*

¶ 115   The *Smith* Court noted that Longoni arrived at the same conclusion as Rast because he relied on her records. *Id.* at 791. To prepare for trial, Longoni reviewed Rast's report and notes,

and when he took the stand, Longoni "referred to those materials and related what was in them, item by item by item." *Id.* He described the scientific procedures Rast had used in her analysis, including the equipment used. *Id.* After Longoni explained the testing process, he offered his " 'independent opinion' " of the test results that found usable quantities of methamphetamines, marijuana, and cannabis. *Id.*

¶ 116   After the jury found the defendant guilty of various drug offenses, he challenged Longoni's testimony on appeal, arguing the use of a substitute expert who had not participated in any of the relevant testing violated his rights under the confrontation clause. *Id.* The Arizona Court of Appeals rejected the defendant's confrontation clause claim and affirmed his convictions. *Id.* The Supreme Court noted that the reviewing court had "relied on Arizona precedent (similar to the Illinois Supreme Court's decision in *Williams*) stating that an expert may testify to 'the substance of a non-testifying expert's analysis, if such evidence forms the basis of the [testifying] expert's opinion.' " *Id.* at 791-92. The Court further explained, "[t]hat is because, the Arizona courts have said, the 'underlying facts' are then 'used only to show the basis of [the in-court witness's] opinion and not to prove their truth.' " *Id.* at 792 (quoting *State ex rel. Montgomery v. Karp*, 336 P.3d 753, 757 (Ariz. Ct. App. 2014)). Under the Arizona court's view, Longoni could constitutionally " 'present[ ] his independent expert opinions' as 'based on his review of Rast's work.' " *Id.* The Supreme Court granted certiorari to consider that reasoning and rejected it. *Id.*

¶ 117   In its analysis, the *Smith* Court first reaffirmed that challenges under the confrontation clause only apply to " 'testimonial *hearsay*' " (emphasis in original) (*id.* at 792 (quoting *Davis*, 547 U.S. at 823)), meaning that, "the Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " (*id.* at 793 (quoting *Crawford*, 541 U.S. at 60 n.9)). The Court explained as an example that, "[i]f Rast's statements came in to

establish the truth of what she said, then the Clause's alarms begin to ring; but if her statements came in for another purpose, then those alarms fall quiet." *Id.* The Court also emphasized that evidentiary rules "do not control the inquiry into whether a statement is admitted for its truth. That inquiry, as just described, marks the scope of a federal constitutional right," which cannot be expanded or contracted by reference to nonconstitutional bodies of law like rules of evidence. *Id.* at 794. Instead, courts must "conduct an independent analysis of whether an out-of-court statement was admitted for its truth, and therefore may have compromised a defendant's right of confrontation." *Id.*

¶ 118 In conducting an independent analysis, "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. How could it be otherwise?" *Id.* at 795. The Court noted that the "whole point" of the prosecutor's eliciting such a statement is the truth of that statement then allows a basis for the jury to credit the testifying expert's opinion. (Internal quotation marks omitted.) *Id.* Indeed, "[t]he jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based." *Id.* at 796 (citing David H. Kaye *et al.*, The New Wigmore: A Treatise on Evidence: Expert Evidence § 5.4.1, p. 271 (3d ed. 2021)). The Court continued, "[i]f believed true, that basis evidence will lead the jury to credit the opinion; if believed false, it will do the opposite." *Id.* To the Court, this is the linchpin of what invokes the confrontation clause problem because "the defendant has no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work." *Id.*

¶ 119 Applying this independent analysis to what happened at trial, the *Smith* Court explained:

"Rast's statements thus came in for their truth, and no less because they were admitted to show the basis of Longoni's expert opinions. All of those opinions were predicated on the truth of Rast's factual statements. Longoni could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what Rast had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results. And likewise, the jury could credit Longoni's opinions identifying the substances only because it too accepted the truth of what Rast reported about her lab work (as conveyed by Longoni). If Rast had lied about all those matters, Longoni's expert opinion would have counted for nothing, and the jury would have been in no position to convict. So the State's basis evidence—more precisely, the truth of the statements on which its expert relied—propped up its whole case. But the maker of those statements was not in the courtroom, and [the defendant] could not ask her any questions." *Id.* at 798.

¶ 120 The *Smith* Court further explained that its decision prevents an end-around to escape the requirements under the confrontation clause. *Id.* at 799. However, it noted that the clause still allows surrogate forensic experts like Longoni to testify about their personal knowledge regarding how the laboratory functions, including standards, practices, and procedures used to test seized substances, as well as proper maintenance of chain of custody. *Id.* In *Smith*, the State used Longoni's testimony to relay Rast's conclusions about the seized substances, effectively becoming "Rast's mouthpiece." *Id.* at 800.

¶ 121 In sum, the *Smith* Court reaffirmed the holding in *Crawford* that "[a] State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her." *Id.* at 802-03 (citing

*Crawford*, 541 U.S. at 68). The Court also reiterated the holding of *Bullcoming*, stating "[n]either may the State introduce those statements through a surrogate analyst who did not participate in their creation." *Id.* at 803 (citing *Bullcoming*, 564 U.S. at 663). Finally,

> "nothing changes if the surrogate—as in this case—presents the out-of-court statements as the basis for his expert opinion. Those statements, as we have explained, come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them." *Id.*

The holding in *Smith* abrogated *Williams v. Illinois*, 567 U.S. 50 (2012) (plurality op.).

¶ 122    We now apply the independent analysis announced in *Smith* to the instant case.

¶ 123                            3. Application of *Smith v. Arizona*

¶ 124    In this case, we consider whether defendant's confrontation clause rights were violated by determining whether Skelcy's laboratory report, which was admitted under the business records exception to the hearsay rule and presented to the jury through Earl's surrogate expert testimony, was testimonial and offered for the truth of the matter asserted. *Smith*, 602 U.S. at 792-93.

¶ 125                    a. Whether the Laboratory Report was Testimonial

¶ 126    In general, a statement is "testimonial" for confrontation clause purposes if the declarant is acting in a manner analogous to a witness at trial, describing or giving information regarding events that have already occurred. *People v. Sutton*, 233 Ill. 2d 89, 111 (2009). A testimonial statement is one which is (1) made in a solemn fashion, and (2) is intended to establish a particular fact. *People v. Stechly*, 225 Ill. 2d 246, 281-82 (2007) (plurality opinion).

> "Examples of testimonial statements include: (1) *ex parte* in-court testimony; (2) extrajudicial statements in formal testimonial materials such as affidavits, depositions,

prior testimony, and confessions; (3) statements made under circumstances that would lead an objective witness reasonably to believe the statements would be available for use at a later trial; and (4) statements taken by police officers in the course of interrogations." *People v. Jacobs*, 405 Ill. App. 3d 210, 216 (2010) (citing *Crawford*, 541 U.S. at 51-52). Our supreme court has held that if a forensic report was " 'made for the purpose of proving the guilt of a particular criminal defendant at trial' [citation], it is testimonial." *Leach*, 2012 IL 111534, ¶ 120.

¶ 127　Here, Skelcy's report *was* prepared with a targeted individual in mind, namely, defendant, for the purpose of providing evidence in the criminal case against him. See *Lewis*, 2019 IL App (1st) 160864, ¶ 44; *Solomon-Bey*, 2021 IL App (2d) 190742-U, ¶ 29; *Conway*, 2023 IL App (1st) 172090-U, ¶ 18. We find that Skelcy's laboratory report and any corresponding documentation used to create the report was testimonial for purposes of the confrontation clause analysis. The forensic report in this case undoubtedly was generated for the purpose of proving the guilt of this defendant at trial. See *Leach*, 2012 IL 111534, ¶ 120. Skelcy's report is an example of a statement made under circumstances that would lead an objective witness to reasonably believe it would be available for use at a later trial. *Jacobs*, 405 Ill. App. 3d at 216. Here, the State does not challenge whether Skelcy's report was testimonial and instead focuses on whether Earl's testimony passes constitutional muster. To answer that question, we next determine whether the surrogate expert opinion Earl conveyed to the jury amounted to an out-of-court statement admitted for the truth of the matter asserted.

¶ 128　　　　　　　b. The Effect of Earl's Surrogate Expert Opinion

¶ 129　Defendant argues that Earl's testimony regarding the identity of the substance, its weight, and other findings and conclusions of the report created by Skelcy, violated his rights under the

confrontation clause because it was based on testimonial hearsay and defendant never had the chance to cross-examine Skelcy prior to trial. Defendant contends that Earl did not provide her own independent conclusions to the jury regarding what she would have found had she interpreted the results. Defendant claims the State admitted that it did not actually seek an expert opinion from Earl and instead sought her testimony as an improper means to admit Skelcy's report.

¶ 130   The State responds that the instant case is distinguishable from *Smith* because Earl was part of the testing process as a peer reviewer of Skelcy's work. The State argues that the death of the forensic analyst should not bar the evidence in its entirety. According to the State, if the person who conducts the forensic testing passes away, there should be a vehicle allowing for the admission of the laboratory report, which was not discussed in *Smith*. The State argues that nothing prevented defendant from questioning Earl about the methods employed by Skelcy. The State contends that defendant had the report before trial and did not ask any questions about the procedures used in the laboratory when Earl was qualified as an expert to answer those questions.

¶ 131   Following *Smith*, we must conduct an independent analysis of whether an out-of-court statement, Skelcy's laboratory report, was admitted for its truth—in this case, the positive cannabis test result. Earl testified that she reviewed the data from Skelcy's worksheet and documentation of the result from the testing of "plant material." The State asked Earl, "[b]ased on your review of Mr. Skelcy's work along with the documents, what did he identify that plant material to be?" Over defendant's objection, Earl answered that Skelcy "identified the plant material as cannabis with Delta-9 THC." Here, if Earl conveyed the results of Skelcy's laboratory report in support of her opinion and the contents of the report support her opinion only if true, then her statement has been offered for the truth of what it asserts. See *Smith*, 602 U.S. at 795.

¶ 132   Applying the independent analysis to the events at trial, we find that Skelcy's laboratory forensic testing results came in for their truth and no less because they were admitted to show the basis of Earl's expert opinions. All her opinions were predicated on the truth of Skelcy's factual statements contained in his report, which was admitted under the business records exception to the hearsay rule (Ill. R. Evid. 803(6) (eff. Jan. 25, 2023)). Although Earl explained the procedures for testing, chain of custody, and policies and procedures of the ISP crime laboratory, she did not provide testimony in accordance with Illinois Rule of Evidence 803(6) to show that the report was kept in the course of a regularly conducted business activity. *Id.* She was neither presented as a custodian of records, nor did the State lay any foundation to establish that Earl was the keeper of records at the ISP crime laboratory. Indeed, Earl testified that she served as a forensic scientist and discussed the training she received to be a drug chemist. The State specifically moved to qualify Earl as an expert in the field of drug chemistry and the trial court found her to be qualified in that subject. Moreover, section 115-5 of the Code of Criminal Procedure codified the exception to the hearsay rule for business records and provides that

> "[n]o writing or record made in the regular course of any business shall become admissible as evidence by the application of this Section if[ ]
>
> ***
>
> *** [s]uch writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind ***." 725 ILCS 5/115-5(c)(2) (West 2020).

¶ 133   Further, Earl could opine that the tested plant material was cannabis only because she accepted the truth of what Skelcy had reported about his work in the laboratory—that he had conducted certain tests according to certain protocols and obtained certain results. We reject the

State's attempt to differentiate this case from *Smith* because Earl "peer reviewed" Skelcy's work. In her 28 years serving as a forensic scientist, Earl had *never* testified as an expert to someone else's laboratory notes. She conducted none of the testing in this case and had no first-hand knowledge. Earl confirmed that a peer reviewer is not present when the sample is actually tested and she agreed that there is no way for a peer reviewer to become aware of any issues with the testing if the forensic scientist who performs the testing does not notate any problems in the laboratory notes. Earl testified that "peer review" is a verification process and is completed only *after* the actual testing itself.

¶ 134    Earl reviewed Skelcy's notes and data and she verified that the data and notes corresponded to the test result. Earl provided no testimony as to when she actually performed the peer review. Her peer review checklist was signed but not dated. Thus, there is no way to verify whether the peer review Earl claimed to correspond with Skelcy's report was completed commensurate with Skelcy's report. In short, Earl's undated peer review amounted to nothing more than quality control and did not rise to the level of first-hand knowledge or participation in the actual testing of the material in this case.

¶ 135    Here, the jury could and apparently did credit Earl's opinion identifying the plant material as cannabis only because it too accepted the truth of what Skelcy had reported about his laboratory forensic testing (as conveyed by Earl). If Skelcy had lied about his test result, Earl's expert opinion would have counted for nothing, and the jury would have been in no position to convict. Thus, the State's presentation of Earl's expert testimony—more precisely, the truth of the statements on which Earl relied—propped up its whole case. But the maker of those statements was not in the courtroom and defendant could not ask him any questions. See *Smith*, 602 U.S. at 798.

¶ 136   In sum, Earl acted as a mouthpiece for Skelcy so that the State could prove beyond a reasonable doubt that the plant material Officer Wilk recovered from defendant was, in fact, cannabis. Earl simply parroted what Skelcy's testimony would have been had Skelcy been available to testify at trial. Presenting Earl as an expert and admitting Skelcy's laboratory report under the business records exception to the hearsay rule were simply attempts by the State to circumvent the protections afforded by the confrontation clause. *Id.* at 794 (noting that the scope of a constitutional right cannot be expanded or contracted by reference to nonconstitutional bodies of law such as rules of evidence). Under *Smith*, the State may not introduce the testimonial out-of-court statements of a forensic analyst at trial through a surrogate analyst who did not participate in their creation and used the testimonial out-of-court statements as the basis for the expert opinion. *Id.* at 802-03. That is exactly what happened in this case. Accordingly, we find that the State violated defendant's rights under the confrontation clause.

¶ 137   Considering that defendant's rights were violated under the confrontation clause, the next question that arises is whether the holding in *Smith* is retroactive to this case. Defendant filed his notice of appeal on March 13, 2024. While his direct appeal was pending, the United States Supreme Court issued *Smith* on June 21, 2024. A basic principle of criminal procedure is that judicial decisions announcing "a new rule for the conduct of criminal prosecutions [are] applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987); *People v. Hudson*, 195 Ill. 2d 117, 126 (2001). Here, because defendant's case is pending on review, the holding in *Smith* applies retroactively. *Griffith*, 479 U.S. at 328; *Hudson*, 195 Ill. 2d at 126.

¶ 138                                    4. Harmless Error

¶ 139    The State next contends that, even if defendant's rights under the confrontation clause were violated, he must show not only that he was denied his constitutional rights, but also that this particular error, in the context of the evidence adduced at trial, was serious enough to render his trial fundamentally unfair. The State maintains that defendant has not met his burden and that any purported error was harmless. The State argues that, to the extent the admission of Earl's testimony that the substance tested positive for cannabis was a constitutional error, defendant has failed to meet his burden of establishing plain error.

¶ 140    In his reply brief, defendant responds that he preserved his right to challenge the constitutional errors because he objected at trial and in a posttrial motion. Defendant agrees that this case is subject to review under harmless error, but because the State never argued that this case should be subject to plain error review, it has forfeited that argument. Defendant contends that the State cannot shift its burden to him to inject a plain error analysis by arguing that the evidence was not closely balanced and defendant failed to meet his burden of persuasion. Defendant notes that the correct standard for raising harmless error after finding a constitutional error is whether the State can prove "beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained," as stated in *Patterson*, 217 Ill. 2d at 428. Defendant maintains that the State cannot meet its burden because Skelcy's forensic report providing the test results was paramount to proving the State's case. Defendant argues that for this reason, the State cannot show that the constitutional error was harmless beyond a reasonable doubt.

¶ 141    Our supreme court in *Patterson* considered the question of whether a confrontation clause violation was harmless beyond a reasonable doubt, finding "the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained."

*Id.* (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). The *Patterson* court also noted that the State "bears the burden of proof." *Id.* In addition, the court elucidated three different approaches for measuring error under the harmless-constitutional-error test: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id.*

¶ 142 Considering the first test, we have already discussed at great length how the error of admitting Earl's surrogate expert testimony contributed to the conviction. Without Earl being able to testify to the conclusions in Skelcy's laboratory report, the jury would not have heard evidence that the plant material defendant gave to Officer Wilk tested positive for cannabis. As to the third test, the improperly admitted evidence in this case is not merely cumulative because it is not duplicative of other testing. Thus, our focus shifts to the second harmless-constitutional-error test.

¶ 143 The State argues that Earl's testimony was not the only evidence that established the substance at issue as cannabis. The State noted Officer Wilk's testimony that, based on his training and experience, he determined the substance to be cannabis. The State contends that Officer Wilk's testimony that he smelled cannabis when he approached defendant's vehicle, his determination that the substance was cannabis, and defendant's confession to having "weed" in his car, along with handing the officer a "blunt" in an unsealed plastic bag, provided sufficient evidence with which to convict defendant of unlawful possession of cannabis by a driver.

¶ 144 In *People v. Park*, 72 Ill. 2d 203, 206 (1978), the defendant was convicted of possession of less than 10 grams of cannabis. The appellate court reversed the conviction because it found that

the State had failed to prove beyond a reasonable doubt that the substance the defendant possessed was cannabis. *Id.*

¶ 145   In *Park*, police officers proceeded to a parking lot to apprehend the defendant after receiving a tip that he was involved in an illegal drug transaction. *Id.* The officers testified at trial that, after they advised the defendant of his *Miranda* rights, (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), he admitted to being in possession of an envelope that contained marijuana. *Park*, 72 Ill. 2d at 206. The defendant testified that he had neither been advised of his *Miranda* rights nor admitted that he had an envelope containing marijuana before the officer showed it to him. *Id.* at 206-07. The only direct evidence that the envelope contained cannabis came from the testimony of Deputy Sheriff Billy Carrico. *Id.* at 207. The State offered to have Deputy Sheriff Carrico testify as to the results of his testing the substance with a "Narco test kit," but because the State was unable to explain the probative value and reliability of the results, the trial court excluded all evidence regarding use of the kit. *Id.* The court did allow Deputy Sheriff Carrico to testify that, as an expert, he could identify marijuana by " 'feel, smell, texture and looks.' " *Id.* The State elicited testimony about the deputy sheriff's experience handling marijuana, but the record also showed that Deputy Sheriff Carrico's identification of a substance as being marijuana had been proved correct on as few as 1 of 40 occasions, a 2.5% accuracy rate. *Id.* Nevertheless, the court considered this experience sufficient to establish the deputy sheriff's expertise in the identification of marijuana and allowed him to tell the jury that, in his opinion, the substance in the envelope was marijuana. *Id.* at 207-08.

¶ 146   The *Park* court stated that, while it agreed with the general proposition that circumstantial evidence can be used to establish that a substance contains cannabis, the court did not agree that the particular circumstantial evidence adduced was sufficient. *Id.* at 212. According to the court,

the defendant's admission was insufficient to convict him of the offense charged. The court stated that, "[e]ven assuming that [the defendant's] alleged statement was admissible ***, its probative value or weight is limited, in the absence of substantial evidence that this 17-year-old defendant had some means of knowing that the substance in question contained cannabis." *Id.* "[T]he well-established rule governing this situation is that requiring substantial, independent corroboration of the defendant's alleged admission of the elements of the *corpus delicti*." *Id.* The court explained that the reason for this rule is "the general problem of the trustworthiness of such alleged admissions and a reluctance to indulge in the fiction that the jury can accurately determine the weight to be given them." *Id.* The court held that the corroborating circumstances and the circumstantial evidence as a whole were insufficient. *Id.* Further, the State provided no proof of any sale of the drugs at a high price suggesting that the principals had taken steps to assure themselves of the identity of the substance. *Id.* "In short, the State would have us cure its lack of diligence in preparing its case by overlooking the substantial possibility that, on the basis of the evidence presented, the substance in question was not cannabis. This we cannot do." *Id.* at 213.

¶ 147   We acknowledge that our supreme court has also held that chemical testing is not necessary to establish that a recovered substance was a controlled substance. *People v. Robinson*, 14 Ill. 2d 325, 330-31 (1958); see *People v. Eichelberger*, 189 Ill. App. 3d 1020, 1027 (1989); *Solomon-Bey*, 2021 IL App (2d) 190742-U, ¶ 35. However, police officers are not presumed to possess the experience required to identify narcotic substances. *Park*, 72 Ill. 2d at 211. In this case, the only testimony Officer Wilk provided on the subject is that he identified the substance was cannabis "[b]ased on [his] training and experience being a police officer." The State did not question Officer Wilk any further regarding his experience of identifying illegal substances. Further, although there was an admission by defendant in this case, the admission was made during a *Terry* stop under the

pressure of a police investigation similar to that of the defendant in *Park*. Thus, the admission's "probative value or weight is limited, in the absence of substantial evidence that [defendant] had some means of knowing that the substance in question contained cannabis." *Id.* at 212. We have no such evidence of defendant's knowledge here. Under the second harmless-constitutional-error test delineated in *Patterson*, we find that the other evidence in this case does not overwhelmingly support the conviction such that the constitutional error was harmless beyond a reasonable doubt.

¶ 148 Based on our conclusion that defendant's rights under the confrontation clause were violated and that this error was not harmless, we reverse defendant's conviction of unlawful possession of cannabis by a driver. The remedy for reversible error is a new trial and, thus, we must consider whether a new trial poses double jeopardy concerns.

¶ 149 Under the fifth amendment to the United States Constitution, no person may "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. Similar provisions also exist in the Illinois Constitution (see Ill. Const. 1970, art. I, § 10) and in state statutes. See 720 ILCS 5/3-4(a) (West 2020). Our supreme court has explained:

"The cornerstone of the double jeopardy clause is 'that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " *People v. Williams*, 188 Ill. 2d 293, 307 (1999) (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)).

¶ 150 Although the double jeopardy clause forbids the retrial of a defendant to afford the State another opportunity to present evidence it failed to present in the first trial, it "does not preclude

retrial when a conviction has been overturned because of an error in the trial proceedings." *People v. Drake*, 2019 IL 123734, ¶ 20. Our supreme court has explained that "[r]eversal for trial error is a determination that the defendant has been convicted by means of a judicial process defective in some fundamental respect, whereas reversal for evidentiary insufficiency occurs when the prosecution has failed to prove its case, and the only proper remedy is a judgment of acquittal." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). Thus, if the evidence presented at the first trial was insufficient to support the defendant's conviction, he cannot be retried. *Drake*, 2019 IL 123734, ¶ 20. "[F]or purposes of double jeopardy *all* evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." (Emphasis added.) *Olivera*, 164 Ill. 2d at 393. "Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction." *Drake*, 2019 IL 123734, ¶ 21 (citing *People v. McKown*, 236 Ill. 2d 278, 311 (2010)).

¶ 151    Here, even though Skelcy's forensic laboratory report and Earl's testimony were admitted in error, in determining whether the double jeopardy clause forbids a retrial, we nevertheless consider those very statements. See *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (for purposes of double jeopardy, "we consider whether the evidence presented at trial, including the now-suppressed handwritten statement, was sufficient to convict"). If there was sufficient evidence presented at the first trial to support defendant's conviction, retrial is the proper remedy. *Drake*, 2019 IL 123734, ¶ 21. In considering the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lopez*, 229 Ill. 2d at 367.

¶ 152   In this case, when considering all the evidence submitted at trial, including the discounted evidence presented in violation of defendant's rights under the confrontation clause, we find that a rational trier of fact could have found the essential elements of unlawful possession of cannabis by a driver beyond a reasonable doubt. *Drake*, 2019 IL 123734, ¶ 21; *Olivera*, 164 Ill. 2d at 393, 396; see *People v. Brown*, 363 Ill. App. 3d 838, 850-51 (2005) (finding retrial not barred by double jeopardy after confrontation clause violation at trial). We therefore remand this cause for a new trial on the charge of unlawful possession of cannabis by a driver.

¶ 153        B. Sufficiency of the Evidence for Criminal Damage to Property

¶ 154   Defendant next claims that the State failed to prove him guilty beyond a reasonable doubt of criminal damage to property due to insufficient evidence of damage to the furnace he urinated on at the police station. Defendant argues that Officer Wilk testified that he was not aware of any damage and that the furnace did not need repairs. He also contends his urine did not impact the furnace's ability to heat air but only left an odor on the outside of the furnace, which was addressed when the furnace was cleaned.

¶ 155   Defendant does not dispute the facts with respect to the charge and instead argues that we should review this issue *de novo* because the State failed to prove the statutory elements of the charge. The State responds that defendant is challenging the sufficiency of the evidence, which requires our review of the evidence in the light most favorable to the prosecution and consideration of whether any rational trier of fact could have found guilt proven beyond a reasonable doubt.

¶ 156   Here, *de novo* review applies because defendant is not disputing the facts and the question of his guilt on the charge of criminal damage to property is therefore a question of law. *People v. Smith*, 191 Ill. 2d 408, 411 (2000). The State charged defendant under section 21-1(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/21-1(a)(1) (West 2020)). See also *id.* § 21-

1(d)(1)(B) ("A violation of paragraph (1) *** is a Class A misdemeanor when the damage to property does not exceed $500."). Section 21-1(a)(1) of the Criminal Code states that "A person commits criminal damage to property when he or she: (1) knowingly damages any property of another[.]" *Id.* § 21-1(a)(1). Defendant argues that, "[b]ecause the urine did not create a loss or injury to the furnace that needed to be addressed by a repair, the urine did not 'damage' the furnace under the word's plain meaning." Defendant claims that because the State did not present evidence at trial of furnace repair beyond its mere cleaning, the State failed to establish the element of damage beyond a reasonable doubt.

¶ 157    The State responds that the language of section 21-1(a)(1) is plain and unambiguous such that this court should apply the statute without resort to further aids of statutory construction. We agree with the State that the language of the statute is plain and unambiguous.

¶ 158    When construing a statute, our goal is to "ascertain and give effect to the intent of the legislature." *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). This inquiry begins with the language of the statute, which is "the best indicator of legislative intent." *Id.* When the language in the statute is clear and unambiguous, we apply the statute as written without resort to extrinsic aids of statutory construction. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 6-7 (2009). This court may employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase. *Id.* at 8 (citing *People v. Beachem*, 229 Ill. 2d 237, 244-45 (2008)); see *People v. Castillo*, 2022 IL 127894, ¶ 24 ("In determining the plain, ordinary, and popularly understood meaning of a statutory term, it is entirely appropriate to look to the dictionary for the definition of a term.").

¶ 159    In this case, defendant challenges the meaning of the term "damages" as provided in section 21-1(a)(1) of the Criminal Code. In his brief, he refers to the definition of the term, "damage," from an online website dictionary, as "injury or harm that reduces value or usefulness."

See Dictionary.com, https://www.dictionary.com/browse/damage (last visited September 29, 2025) [https://perma.cc/4T9X-KJG4]. According to defendant, this definition "is in line with how courts have held the cost of repairs as the proper measure of criminal damage," citing *People v. Carraro*, 67 Ill. App. 3d 81, 88 (1979), and *People v. Vega*, 408 Ill. App. 3d 887, 890 (2011).

¶ 160   However, in *Carraro*, the defendants actually "admitted causing certain damage to the automobile" in an attempt to incriminate each other. 67 Ill. App. 3d at 85-86. The issue in *Carraro* involved whether damages exceeded $150, not whether the defendants actually caused damage warranting their convictions for criminal damage to property. *Id.* at 87. This court concluded that the proper *measure* of damages was the cost of repairs, which "is probably the most accurate indication of the *amount* of damage caused," not whether the defendants caused "damage" under the statute. (Emphasis added.) *Id.* at 88. *Vega* addressed "the effect of wrongly charged sales tax on a determination of the *amount* of damage to property," not whether the State presented sufficient evidence of damages to establish the charge of criminal damage to property beyond a reasonable doubt. (Emphasis added.) 408 Ill. App. 3d at 889-90. Both *Carraro* and *Vega* are inapplicable here.

¶ 161   Notably, defendant did not provide this court with the definition of the term "damage" from Black's Law Dictionary. "Damage" is defined as "[l]oss or injury to person or property," or "[b]y extension, any bad effect on something." Black's Law Dictionary (10th ed. 2014). In our view, defendant's act of urinating on a furnace comported with the definition of damage as defined in Black's Law Dictionary because it had a "bad effect" on the furnace, which necessitated a cleaning to restore the furnace to its prior condition. Whether defendant's act caused the furnace to malfunction in any way is irrelevant to whether he caused damage as defined above. The criminal damage to property statute contains no requirement that the "damage" be permanent or irremediable. 720 ILCS 5/21-1(a)(1) (West 2020). We will not read a temporal limitation into the

statute when no such language is included. See *People v. Lavallier*, 187 Ill. 2d 464, 468 (1999) ("When the language of a statute is plain and unambiguous, courts will not read in exceptions, limitations, or other conditions."). Even if we considered defendant's proposed definition that damage is an "injury or harm that reduces value or usefulness," it follows logically that urinating on a furnace causes harm that reduces value or usefulness due to the cost required to clean it, essentially putting the furnace in the same condition that it was in before defendant urinated on it.

¶ 162   In short, defendant's act of urinating on the furnace caused damage to the furnace under section 21-1(a)(1) of the Criminal Code. 720 ILCS 5/21-1(a)(1) (West 2020). Therefore, we hold that the State proved defendant guilty of criminal damage to property beyond a reasonable doubt and we affirm defendant's conviction of that charge.

¶ 163   Because of our disposition of these issues, we need not address any of the remaining contentions raised in defendant's appeal.

¶ 164                                III. CONCLUSION

¶ 165   For the reasons stated, we affirm in part and reverse in part the judgment of the circuit court of Kane County and remand this case for a new trial on the charge of unlawful possession of cannabis by a driver.

¶ 166   Affirmed in part and reversed in part.

¶ 167   Cause remanded.

¶ 168   JUSTICE HUTCHINSON, concurring in part and dissenting in part:

¶ 169   I respectfully dissent because, while the admission of Earl's testimony was error, that error was harmless considering the other evidence that the plant material in defendant's possession was cannabis.

¶ 170    Admission of testimonial hearsay is error unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination. *People v. Barner*, 2015 IL 116949 ¶ 71. Upon showing such error, the defendant is entitled to a new trial unless it appears beyond a reasonable doubt that the error did not contribute to the verdict. *Id.* When determining whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Id.* While the State must prove the identity of an alleged controlled substance, it need not do so through chemical testing. *People v. Eichelberger*, 189 Ill. App. 3d 1020, 1027 (1989). It may do so via circumstantial evidence. *Id.*

¶ 171    The majority believes that, because the trial court improperly admitted Earl's testimony, defendant is entitled to a new trial on the charge of unlawful possession of cannabis by a driver. I believe that this view overstates the significance of Earl's testimony on the jury's verdict. Earl's testimony established the following points: (1) Skelcy had tested certain plant material; (2) State's exhibit No. 2, obtained from the Carpentersville Police Department, was likely the same plant material that Skelcy tested; (3) Skelcy's tests obtained positive readings for cannabis; and (4) Skelcy's tests were reliable and in line with normal procedures. This testimony, while undeniably helpful to the State's case, was largely cumulative concerning the possession charge. Prior to Earl's testimony, the jury heard the testimony of Officer Wilk of the Carpentersville Police Department. Wilk testified that (1) an odor of cannabis emitted from defendant's car and from his person; (2) defendant admitted to smoking cannabis with his family prior to driving; (3) defendant informed Officer Wilk that he had a "blunt" in his car; and (4) he handed Officer Wilk a clear

plastic bag containing 3.2 grams of suspected cannabis. The State then played for the jury Officer Wilk's dashcam video, which—from the jury's verdict—we can surmise corroborated his testimony. Finally, the State authenticated and admitted into evidence the 3.2 grams of suspected cannabis.

¶ 172   What, then, was the effect of Earl's testimony? Is it reasonable to conclude that this jury would have acquitted defendant absent Earl's second-hand testimony? The jury had access not only to Wilk's testimony and defendant's admission, but also to the suspected cannabis itself. It is implausible to conclude that the verdict turned on this testimony on "Duquenois-Levine" and "gas chromatography mass spectrometry." Jurors have eyes, they have noses, and they have common sense. If plant material looks like cannabis, feels like cannabis, smells like cannabis, and defendant himself admits that it is cannabis, then it is presumably cannabis.

¶ 173   Contrast the evidence in the present case with that in *People v. Park*, 72 Ill. 2d 203 (1978). As the majority notes, in *Park*, the only evidence that the defendant possessed cannabis came via the officer's testimony and the defendant's admission. *Id.* at 207. The *Park* court disregarded the officer's testimony, while downplaying Park's admission. As for the latter, the court observed that "the absence of substantial evidence that [the] 17-year-old [Park] had some means of knowing that the substance in question contained cannabis" meant that the court could give it little weight. *Id.* at 212. Can the same be said here? By his own admission, defendant was familiar with cannabis, having smoked it the evening of his arrest. He told the arresting officer that he had a "blunt" in his car, thereby demonstrating his familiarity with both cannabis-related terminology, as well as with a popular means of its consumption. Unlike in *Park*, the defendant here volunteered the suspected cannabis prior to any search of his vehicle. Defendant, moreover, is a 35-year-old man, living at a

time when consuming cannabis is both legal and common. Park, in contrast, was a teenager, living at a time when cannabis was both illegal and less familiar.

¶ 174    I acknowledge the possibility that certain other plant material could look, feel, and smell like cannabis. I also acknowledge that that defendant could have conceivably identified the plant material as cannabis by mistake. The relevant inquiry, however, is not what is conceivable, but whether a reasonable doubt exists. *Barner*, 2015 IL 116949 ¶ 71. Without Earl's testimony, is it reasonable to doubt the plant material's identity? By ordering a new trial, the majority is—in effect—answering that question in the affirmative. That conclusion, in my view, defies common sense and the record.

¶ 175    For the foregoing reasons, I would affirm defendant's conviction of unlawful possession of cannabis by a driver. I agree with the majority in affirming the conviction of criminal damage to property.

*People v. Holmes*, **2025 IL App (2d) 240194**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, Nos. 20-TR-1770, 20-CM-153; the Hon. Rene Cruz, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Annie Cebulski, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Gabrielle Moore, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |